RESPONSIBLE USE OF RURAL AND AGRICULTURAL LAND (RURAL), Petitioner-Appellant,

Daniel GOMEZ-IBANEZ, Wendy Lynn Lein, Lynn Needham, and Kathryn A. Nekola, Petitioners,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN and Wisconsin Department of Natural Resources, Respondents-Respondents,

ROCKGEN ENERGY LLC, Polsky Energy Corporation, and Alliant Energy-Wisconsin Power and Light Company, Intervenors-Respondents-Respondents.

VILLAGE OF ROCKDALE, Petitioner-Co-Appellant,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Respondent,

ROCKGEN ENERGY LLC, Polsky Energy Corporation, and Alliant Energy-Wisconsin Power and Light Company, Intervenors-Respondents-Respondents.

Supreme Court

*No. 99–2430. Oral argument September 6, 2000.—Decided December 19, 2000.*

2000 WI 129

(Also reported in 619 N.W.2d 888.)

For the petitioner-appellant, RURAL, there were briefs (in the court of appeals) by *Susan Hedman* and *Environmental Law & Policy Center of the Midwest*, Chicago, and oral argument by *Susan Hedman*.

For the petitioner-co-appellant, Village of Rockdale, there were briefs (in the court of appeals) by *Allen D. Reuter, Kim I. Moermond* and *Reuter & Whitish, S.C.*, Madison, and oral argument by *Allen D. Reuter*.

For the respondent-respondent, Public Service Commission of Wisconsin, there was a brief (in the court of appeals) by *Kevin B. Cronin*, assistant general counsel, Madison, and oral argument by *Kevin B. Cronin*.

For the respondent-respondent, Wisconsin Department of Natural Resources, the cause was argued by *Frank D. Remington*, assistant attorney general, with whom on the brief (in the court of appeals) was *James E. Doyle*, attorney general.

For the intervenors-respondents-respondents, Rockgen Energy LLC and Polsky Energy Corporation, there was a brief (in the court of appeals) by *Peter L. Gardon, Raymond M. Roder, Stephanie L. Mott* and *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.*, Madison, and oral argument by *Peter L. Gardon*.

For the intervenor-respondent-respondent, Alliant Energy-Wisconsin Power and Light Company, there was a brief (in the court of appeals) by *Ritchie J. Stur-*

663

*geon*, Madison, and oral argument by *Ritchie J. Sturgeon*.

An amicus curiae brief was filed by *Terrence C. Thom, Rocke A. Calvelli, William P. Croke* and *Quale, Feldbruegge, Calvelli, Thom & Croke, S.C.*, Milwaukee, on behalf of the Wisconsin Utilities Association.

An amicus curiae brief was filed by *Frank J. Jablonski* and *Porter, Jablonski & Associates, S.C.*, Madison, on behalf of Wisconsin's Environmental Decade, Citizens Utility Board, Senators Fred A. Risser and Charles Chvala, and Representative Tom Hebl.

An amicus curiae brief was filed by *Cal W. Kornstedt*, corporation counsel, and *Maureen A. Plunkett*, assistant corporation counsel, on behalf of the County of Dane.

¶ 1.  N. PATRICK CROOKS, J.  This appeal is before the court on bypass from the court of appeals pursuant to Wis. Stat. (Rule) § 809.61 (1997–98).[1] Petitioner-Appellant, Responsible Use of Rural and Agricultural Land (RURAL), and Petitioner-Co-Appellant, the Village of Rockdale (Rockdale), appeal an order of the circuit court for Dane County, Honorable Gerald C. Nichol, Judge, dismissing RURAL and Rockdale's petitions challenging an Order of the Public Service Commission of Wisconsin (PSC) entered in PS C docket numbers 9335–CE–101, 6680–CE–155 and 6630–CE–263 (Order) and the related Wisconsin

---

[1] Wisconsin Stat. § (Rule) 809.61 (1997–98) provides:

The supreme court may take jurisdiction of an appeal or other proceeding in the court of appeals upon certification by the court of appeals or upon the supreme court's own motion.

All subsequent references to the Wisconsin Statutes are to the 1997–98 text unless otherwise noted.

Department of Natural Resources' Record of Decision. The PSC's Order, dated December 18, 1998, granted a certificate of public convenience and necessity for the construction and operation of a natural gas-fired electric generation power plant with a capacity of up to 525 megawatts (MW) located in the Town of Christiana, Dane County, Wisconsin.[2] The Department of Natural Resources' (DNR's) Record of Decision, dated December 15, 1998, certified that the PSC and the DNR complied with the Wisconsin Environmental Protection Act with respect to their review of the proposed project.

¶ 2. The circuit court determined that the PSC and the DNR properly applied an expedited review process contained in the nonstatutory provision of § 96 of 1997 Wisconsin Act 204 to the application for the certif-

---

[2] The PSC's Order pertained to three related applications: (1) Under docket number 9335–CE–101, the Application of RockGen Energy LLC (Polsky Energy Corporation) for Authority to Construct and Place in Operation a Simple-Cycle Combustion Turbine Generating Facility, Known as the RockGen Energy Center to be Located in Dane or Rock County; (2) under docket number 6880–CE–155, the Application of Alliant-Wisconsin Power and Light for Authority to Construct and Operate a New Substation and 138 kV [kilovolt] Transmission Line, or Update and Relocate an Existing 138 kV Transmission Line, Make Necessary Substation and 138–69 kV Transformer Modifications Associated With the RockGen Energy Center; and, (3) under docket number 6630–CE–263, the Application of Wisconsin Electric Power Company for Transmission System Improvement Associated With the RockGen Energy Center. The first application is at issue here. The capacity refers to the maximum megawatts of electricity the power plant can generate in one hour.

icate of public convenience and necessity.[3] The circuit court found that the PSC properly placed conditions on the Order issuing the certificate of public convenience and necessity. The circuit court also found that the PS C sufficiently considered land use concerns in reviewing the certificate application. We agree that § 96 of 1997 Wisconsin Act 204 (Act 204) applied here.[4] We

[3] Nonstatutory provisions are those provisions the legislature enacts but are not codified in the Wisconsin Statutes. Nonstatutory provisions typically involve legislation of limited application or limited duration, or both.

[4] The pertinent parts of § 96 of 1997 Wisconsin Act 204 are as follows:

Section 96. Nonstatutory provisions.

(1) REQUESTS FOR PROPOSALS FOR ELECTRIC GENERATION CAPACITY:

(a) In this subsection:

1. "Certificate" means a certificate issued by the commission under section 196.49 of the statutes or under section 196.491(3) of the statutes, as affected by this act.

2. "Commission" means the public service commission.

3. "Contractor" means a person specified in paragraph (b) 3. that enters into a contract with an eastern Wisconsin utility for the construction of electric generation capacity.

4. "Department" means the department of natural resources.

5. "Eastern Wisconsin utility" has the meaning given in section 196.377(2)(a)1. of the statutes, as created by this act. . . .

(b) By July 31, 1998, or a later date approved by the commission, each eastern Wisconsin utility that, before the effective date of this paragraph, has issued a request for proposals soliciting bids for contracts for the construction of new electric generation capacity shall do each of the following:

1. Complete its evaluation of the bids that were submitted in response to the request for proposals.

2. Select the bids for which it intends to award the contracts.

3. Enter into contracts with the persons who submitted the bids specified in subdivision 2. for the construction of the new electric generation capacity.

(c) Notwithstanding section 196.491(3)(a)1. of the statutes, as affected by this act, no later than August 31, 1998, each [contrac-

666

also agree that the PSC did not err in placing the conditions it did on its Order. The PSC and the DNR reasonably interpreted and applied § 96 of Act 204 and other relevant provisions of the Wisconsin Statutes to fulfill the salutary purposes thereof. We have not found a more reasonable interpretation, nor have we been provided one. Moreover, substantial evidence and reasoning evident in the record support the PSC's and the

tor] specified in paragraph (b) (intro.) shall apply to the commission for any certificate that is required for construction of new electric generation capacity under the contracts into which it enters under paragraph (b)3. and, if required under section 196.491(3)(a)3.a. of the statutes, as affected by this act, submit an engineering plan to the department as specified in section 196.491(3)(a)3.a. of the statutes, as affected by this act.

(d) Notwithstanding section 196.491(3)(a)3.a. and b. of the statutes, as affected by this act, if [a contractor] specified in paragraph (b) (intro.) submits an engineering plan to the department under paragraph (c), the [contractor] and the department shall satisfy each of the following:. . .

4. The department shall complete action on an application submitted under subdivision 2. or re-filed under subdivision 3. within 45 days after the date on which the application is determined or considered to be complete under subdivision 3.

(e) Notwithstanding section 196.491(3)(a)2., (b) and (g) 1. and 2. of the statutes, as affected by this act, the commission and [a contractor] specified in paragraph (b) (intro.) that applies for a certificate under section 196.491(3) of the statutes, as affected by this act, shall satisfy each of the following:. . .

3. The commission shall take final action on the application within 90 days after the application is determined or considered to be complete under subdivision 1. If the commission fails to take final action within the 90-day period, the commission is considered to have issued a certificate with respect to the application. 1997 Wis. Act 204, § 96(1)(a)1.–5., (b), (c), (d)4., (e)3.

The bracketed references to "contractor" reflect an amendment that substituted the term "contractor" for the term an "eastern Wisconsin utility" in subdivisions (1)(c), (d) and (e). 1997 Wis. Act 306, §§ 7d – 7f.

DNR's findings. We therefore affirm the circuit court's decision.

## I

¶ 3. A certificate of public convenience and necessity is a statutory prerequisite for the construction and operation of a facility that generates 100 MW or more of electricity. Wis. Stat. § 196.491(1)(e), (g), (3)(a). Wisconsin Stat. § 196.491(3) and related provisions govern the certificate application process. "No person may commence the construction of a facility unless the person has applied for and received a certificate of public convenience and necessity from the commission as provided in this section." Wis. Stat. § 196.491(3)(a)1.[5]

¶ 4. In 1997, Act 204 modified the application process for certificates of public convenience and necessity. Act 204 eliminated over a year from the process. 1997 Wis. Act 204, §§ 63–67; *compare also* Wis. Stat. § 196.491(2m) and (3) (1995–96) *with* Wis. Stat. § 196.491(3) (1997–98). Prior to Act 204, an engineering plan had to be filed with the DNR 120 days before the application for a certificate of public convenience and necessity was filed with the PSC. Wis. Stat. § 196.491(2m), (3) (1995–96). The certificate application had to be filed with the PSC 18 months before construction began. *Id.* Since Act 204, an engineering plan must be filed 60 days before the certificate application, and the certificate application needs to be filed six months before construction begins. Wis. Stat. § 196.491(3). Act 204 also repealed the provision that

[5] "Commission" refers to the PSC. Wis. Stat. § 196.01(2m). With respect to an electric generating facility, the term "facility" refers to "electric generating equipment and associated facilities designed for nominal operation at a capacity of 100 megawatts or more." Wis. Stat. § 196.491(1)(g).

the PSC could approve a utility's application for a certificate of public convenience and necessity only if the proposed facility substantially complied "with the most recent advance plan filed. . .and approved by the commission." Wis. Stat. § 196.491(3)(d)1 (1995–96); 1997 Wis. Act 204, § 69. Section 96 of Act 204 further shortened the timeline for qualified certificate applications, compressing the review time to approximately 90 days. *Compare* 1997 Wis. Act 204, § 96(1)(c)–(e) *with* Wis. Stat. § 196.491(3).

¶ 5.  The facts surrounding the application for a certificate of public convenience and necessity at issue here are not in dispute. Beginning in the summer of 1997, concerns arose regarding the reliability of Wisconsin's supply of electricity. "Wisconsin faced unprecedented power supply problems due to extended unexpected generating plant outages, a delay in the online availability of a new power plant, and a seriously constrained transmission system." Order at 4.[6] During this time, the PSC determined that there was an unacceptable level of risk in the current electric generating capacity in eastern Wisconsin and concluded that there was an immediate need for 500 MW of additional electric generation capacity. In September 1997, the PSC issued a report to Governor Tommy G. Thompson recommending that 500 MW be added to Wisconsin's electric generation capacity on an expedited basis.

¶ 6.  Also in September 1997, the PSC directed utilities that supply electricity to eastern Wisconsin, Wisconsin Electric Power Company (WEPCO), Wisconsin Power and Light Company, and Madison Gas and Electric Company (MGE), to submit detailed supply plans indicating how they intended to secure the elec-

---

[6] The PSC's Order is found in the record at 27:100. Page references herein are to page numbers of the Order.

tric generating capacity required to meet the needs of its customers.[7] The PSC specifically required Wisconsin Power and Light Company, now known as Alliant Energy-Wisconsin Power and Light Company (Alliant-WPL), to prepare a plan to procure a firm resource to supply 170 MW of additional electric generation capacity.

¶ 7.   On December 4, 1997, Alliant-WPL issued a request for proposals or bids for additional electric generation capacity in order to comply with the PSC's mandate. According to Alliant-WPL's request for proposals, Alliant-WPL had an immediate need for 150 MW peak capacity.[8] Alliant-WPL's request also pointed to the larger need for 500 MW of capacity in eastern Wisconsin and indicated that one of its sites between Janesville and Beloit could support an electric generation plant of that size and should be considered. The proposals were due on February 27, 1998.

¶ 8.   On July 30, 1998, Alliant-WPL informed the PSC that it had entered into an agreement in principle with RockGen Energy LLC and Polsky Energy Corporation (collectively, RockGen) for the construction of a new electric generation power plant in conformance with the requirements of § 96 of Act 204. On August 10, 1998, Alliant-WPL entered into a Power Purchase Agreement with RockGen. On August 13, 1998, the PSC notified Alliant-WPL of its finding that the contract between Alliant-WPL and RockGen met the conditions of § 96(1)(b)3.

---

[7] These three utilities are also known and referred to herein as eastern Wisconsin utilities. See Wis. Stat. § 196.377(2)(a)1.

[8] Peak capacity is that capacity for electricity that is reserved for those times when demand peaks or exceeds its normal level, for example, during the summertime.

¶ 9. The Power Purchase Agreement has been designated as a confidential document by the circuit court. Although the exact terms of the Agreement are confidential, the parties disclosed pertinent aspects of the Agreement in their submissions to this court and at oral argument. According to the Agreement, RockGen will supply Alliant-WPL with electricity when needed during peak times. The Agreement also indicates that Alliant-WPL has the first right to electricity generated by the plant, and that RockGen could sell the electricity to others when Alliant-WPL does not have a need for it.

¶ 10. On August 31, 1998, RockGen submitted an application to the PSC for a certificate of public convenience and necessity to construct and operate a wholesale merchant plant.[9] The 770-page application proposed a 525 MW plant at a site in the Town of Christiana in Dane County, or, alternatively, a 350 MW plant at a site in Johnstown Township in Rock County.

¶ 11. The PSC reviewed RockGen's certificate application, and the DNR reviewed the engineering plan for the proposed plant. On September 10, 1998, the DNR notified RockGen of the permits needed from the DNR for the construction and operation of the proposed plant, which included a high capacity well permit and an air pollution control permit; RockGen

---

[9] Wholesale merchant plants were first allowed in Wisconsin as a result of 1997 Wisconsin Act 204. 1997 Wis. Act 204, §§ 38, 69, 81. Wholesale merchant plants are electric generating facilities that are not owned by a public utility but can supply electricity to a utility at wholesale. Wis. Stat. § 196.491(1)(w). Wholesale merchant plants cannot provide electric service to any retail customer in Wisconsin, but may provide electric service to retail customers outside Wisconsin. *Id.*; *see also* Wis. Stat. § 196.491(3m).

then applied for the required permits. On September 15, 1998, the PSC notified RockGen that its application for a certificate of public convenience and necessity was incomplete; but after RockGen submitted additional material, the PSC determined that the application was complete on September 22, 1998.

¶ 12. The PSC and DNR also prepared an Environmental Impact Statement (EIS) evaluating the environmental impact of RockGen's proposed facilities at both the Christiana and Johnstown sites. The DNR issued the EIS on October 31, 1998, and it remained open for public comments until November 20, 1998. According to the EIS, the impact of the construction and operation of the proposed facility on human environment in Christiana—air quality, water quality, vegetation, wetlands, as well as property values, recreation, aesthetics, zoning, traffic, etc.—would be minimal.

¶ 13. On October 16, 1998, the PSC issued a public notice of RockGen's pending application and upcoming public hearings. The PSC held public hearings both during the day and in the evening in Cambridge and Janesville, on November 16 and November 17, 1998, respectively. The PSC also held hearings during the day on November 18, 19, and 20, 1998, in Madison. Over 185 individuals testified at the hearings.

¶ 14. RURAL and Rockdale, as well as Alliant-WPL and RockGen, participated as full parties in RockGen's certificate application process.[10] RURAL's interest arose from its purpose to maintain the rural

[10] Full party status allows a person or entity to actively participate in the PSC certificate application process by making motions and an opening statement, presenting evidence, cross-examining witnesses and presenting rebuttal evidence. *Wiscon-*

and agricultural character of eastern Dane County and adjacent western Jefferson County, and to promote environmental quality thereof. Rockdale's interest arose from its extra-territorial zoning jurisdiction over the Town of Christiana. Among other things, RURAL and others objected to the scope of the EIS and the short time to review it. They also expressed a number of concerns about the possible impact of the project.

¶ 15. On December 15, 1998, the DNR notified the PSC that its review of two outstanding permits would be concluded shortly. Also on December 15, 1998, the DNR issued its Record of Decision, concluding that RockGen's proposed 525 MW plant in Christiana could comply with all regulatory requirements and that the DNR complied with the applicable provisions of the Wisconsin Environmental Protection Act in reviewing the proposed project. The next day, the DNR issued one of the outstanding permits. The DNR subsequently issued the other, an air pollution control permit, on January 25, 1999.

¶ 16. On December 18, 1998, the PSC issued its Order on RockGen's certificate application, which included Findings of Fact, Conclusions of Law, Decision, and Certificate of Public Convenience and Necessity. The Order issued a certificate for a plant at the Christiana site and explained that "[s]everal factors establish the reasonableness of the Project at the Christiana site."

> A large electric substation is approximately 0.25 mile from the site. [A] natural gas transmission pipeline is located approximately eight miles from the site. The town planning committee recom-

sin Envtl. Decade v. Public Serv. Comm'n, 84 Wis. 2d 504, 528, 267 N.W.2d 609 (1978).

mended overwhelmingly (5–0–1) to permit the Facility in an area otherwise zoned agricultural. Construction at the Christiana site will require far less disruption of the surrounding areas than would be required in Johnstown. Greater environmental impacts would arise from construction in Johnstown, including impacts to the extensive wetlands adjacent to the Mukwonago River and Lulu Lake and damage to natural areas, including the Young Prairie and the Kettle Moraine State Forest with a large southern oak forest.

Order at 5. The Order also imposed a number of conditions to address environmental, aesthetic, land use, and permitting concerns.

¶ 17. Two of the three PSC commissioners voted in favor of the project. The third dissented, expressing his belief that § 96 was intended to apply to an application for a plant with a capacity of no greater than 170 MW based upon the PSC's September 1997 directive that Alliant-WPL obtain 170 MW of firm capacity.

¶ 18. In January 1999, RURAL and Rockdale each petitioned Dane County Circuit Court for review of the PSC's Order and the DNR's Record of Decision pursuant to Wis. Stat. Chapter 227, and Alliant-WPL and RockGen intervened. The circuit court then consolidated RURAL and Rockdale's petitions. On July 26, 1999, the circuit court affirmed the PSC's Order and the DNR's Record of Decision. The circuit court found that there was substantial evidence in the record to support the PSC's findings of fact. The court concluded, applying a due deference standard of review, that the PSC properly interpreted § 96 to apply to RockGen's certificate application for the project. The circuit court also concluded that the PSC properly interpreted the law to impose the conditions it did on RockGen's certifi-

cate of public convenience and necessity. The circuit court thus dismissed RURAL and Rockdale's petitions.

¶ 19.   On September 20, 1999, RURAL and Rockdale appealed the circuit court's order dismissing their petitions. Pending the appeal, RURAL asked the circuit court for a stay of the plant construction. The circuit court denied the motion; RURAL renewed it in the court of appeals. Meanwhile, RockGen moved this court to bypass the court of appeals. We granted the motion for bypass. RURAL then moved this court for a stay pending the appeal. The court denied the motion,

> "noting, [in its Order], that the respondents have acknowledged that by proceeding with construction during the pendency of this appeal, they are proceeding at their own risk, that they have a duty and capability to remediate, and that they can and will remediate the site should the certificate authorizing this construction be vacated on appeal."

The parties informed us at oral argument that construction had begun.

## II

¶ 20.   An administrative agency's statutory construction and application thereof to the presented facts involve questions of law that are subject to judicial review. *Brauneis v. LIRC*, 2000 WI 69, ¶ 15, 236 Wis. 2d 27, 612 N.W.2d 635. Correspondingly, although we ultimately affirm the circuit court's decision, the focus of our review is the PSC's Order and the DNR's Record of Decision, not the circuit court's decision. *Id.* at ¶ 14. Insofar as the PSC's and the DNR's statutory construction depend upon their factual findings, we review those findings to determine whether there is substan-

tial evidence to support them. "Substantial evidence does not mean a preponderance of the evidence. Rather, the test is whether, taking into account all the evidence in the record, 'reasonable minds could arrive at the same conclusion as the agency.' " *Madison Gas & Elec. Co. v. Public Serv. Comm'n*, 109 Wis. 2d 127, 133, 325 N.W.2d 339 (1982) (quoting *Sanitary Transfer & Landfill, Inc. v. DNR*, 85 Wis. 2d 1, 15, 270 N.W.2d 144 (1978)). Where there is substantial evidence in the record, we will uphold those findings. Wis. Stat. § 227.57 (6).

¶ 21. Even though the court is not bound by the agencies' statutory interpretation here, circumstances may warrant according some level of deference to their interpretation. *Brauneis*, 2000 WI 69, ¶ 15. Depending upon the circumstances of the case, we will review an agency's statutory interpretation according to one of three levels: great weight deference, due weight deference and *de novo* review. *Id.*

■

¶ 22. For divergent reasons, RURAL and Rockdale contend that no deference should be accorded to the PSC and DNR's decisions, and the court should review them *de novo*. *De novo* review is appropriate where there is no evidence that the agency used any special knowledge or expertise, the issue is clearly one of first impression, or the agency's position on an issue has been inconsistent. *Id.* at ¶ 18. *De novo* review is not appropriate here because both the DNR and the PSC relied upon their special knowledge and expertise to process RockGen's certificate application. The PSC and the DNR each have responsibilities for processing applications for certificates of public convenience and necessity. Wis. Stat. § 196.491(3); *see also* 1997 Wis. Act 204, § 96(1). The DNR, with the PSC, prepared a

676

200-page EIS. The PSC reviewed and processed a 770-page certificate application, and considered the testimony of nearly 200 individuals. The administrative record amassed here exceeds 3400 pages. The DNR and PSC processed RockGen's application as they would have any other application, only in a shorter time. Section 96 expedited the certificate application process; it did not substantively change the procedure. *Compare* 1997 Wis. Act 204, § 96(1) *with* Wis. Stat. § 196.491(3).

¶ 23.    Alliant-WPL and RockGen contend that the PSC and DNR's statutory interpretations should be accorded great weight deference.

> Great weight deference is appropriate once a court has concluded that: (1) the agency was charged by the legislature with the duty of administering the statute; (2) that the interpretation of the agency is one of long-standing; (3) that the agency employed its expertise or specialized knowledge in forming the interpretation; and (4) that the agency's interpretation will provide uniformity and consistency in the application of the statute.

*Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 660, 539 N.W.2d 98 (1995). We disagree. Even though the PSC's and DNR's interpretation of the provisions governing the substantive review of certificate applications in Wis. Stat. § 196.491(3) is long-standing, their interpretation of § 96 and Act 204 is not, and could not be, one of long-standing. There is no indication that the agencies had used § 96 prior to RockGen's application.[11] Act 204

---

[11] We know of only one other application that the PSC processed according to § 96 of Act 204. The resulting order, PSC Order for Application of SEI Wisconsin, LLC et al., Docket No. 9338–CE–10 dated February 2, 1999 (SEI Order), suggests that the PSC's approach under § 96 may have been inconsistent.

also first allowed for wholesale merchant plants and eliminated the requirement that a certificate application had to substantially comply with an advance plan that the PSC previously approved. Wis. Stat. § 196.491(3)(d)1. (1995–96); 1997 Wis. Act 204, §§ 38, 69, 81; *see also* Wis. Stat. § 196.491(1)(w), (3m)(d). Act 204, and particularly § 96, present novel circumstances, making great weight deference inappropriate. *Brauneis*, 2000 WI 69, ¶ 18.

¶ 24.  The standard of review that the DNR advocates, due weight deference, is the appropriate standard of review. Due weight deference, the middle ground between great weight deference and *de novo* review, is warranted where an agency has some experience in the area, but has not developed any particular expertise in interpreting and applying the statute at

There, the PSC considered a certificate application for a wholesale merchant plant with a capacity of 300 to 360 MW. SEI Order at 2, 10. The proposed plant was to supply another eastern Wisconsin utility, WEPCO, with electricity. *Id.* at 2. The PSC had, in September 1997, as it did with Alliant-WPL, ordered WEPCO to procure needed additional capacity; however, the amount was 250 MW. *Id.* at 1. The PSC considered in the SEI Order that WEPCO's projected needs had increased since September 1997. *Id.* at 1–2. Here, in contrast, the PSC did not consider that Alliant-WPL's projected needs had also increased since September 1997. Instead, regarding RockGen's certificate application, the PSC concluded that "[b]ecause the Facility is a wholesale merchant plant, the Commission was not permitted to consider whether the Facility would satisfy the reasonable needs of the public for an adequate supply of electricity under Wis. Stat. § 196.491(3)(d)2." Order at 6. That the PSC appears to have inconsistently applied § 96 argues against both *de novo* review and great weight deference. *See Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 660, 539 N.W.2d 98 (1995).

hand that positions the agency more favorably to interpret that statute than a reviewing court.

> The deference allowed an administrative agency under due weight is not so much based upon its knowledge or skill as it is on the fact that the legislature has charged the agency with the enforcement of the statute in question. Since in such situations the agency has had at least one opportunity to analyze the issue and formulate a position, a court will not overturn a reasonable agency decision that comports with the purpose of the statute unless the court determines that there is a more reasonable interpretation available.

*UFE, Inc. v. LIRC*, 201 Wis. 2d 274, 286–87, 548 N.W.2d 57 (1996).[12] Even though the DNR and PSC are charged with, and have substantial experience in, processing certificate applications and related environmental impact statements, they had not yet developed any particular expertise in processing certificate applications under § 96's expedited procedures, or applications involving wholesale merchant plants, as of the time they reviewed RockGen's application. Consequently, "[t]his is precisely the situation that

---

[12] Contrary to the dissent's interpretation of the due weight deference standard of review, at ¶¶ 100–106, the standard is not outcome determinative. Regardless of the court's conclusion, the due weight deference standard remains the same. Indeed, the outcome does not dictate the standard of review, but rather, it is the relative circumstances of the administrative agency's experience vis-à-vis the statute that the agency is interpreting that is determinative. Due weight deference will result in a court upholding a reasonable decision by the agency, that is consistent with the purpose of the statute, unless the reviewing court finds a more reasonable interpretation. *Id.*

warrants due weight deference." *Brauneis*, 2000 WI 69, ¶ 19.

¶ 25. Due weight deference accords an agency's statutory interpretation and application some weight; however, the agency's interpretation and application are not conclusive. *UFE, Inc.*, 201 Wis. 2d at 286–87. If the agency's interpretation complies with the statutory purpose and is reasonable, we will not overturn it. *Id.* Accordingly, we now turn to RURAL's and Rockdale's challenges to determine whether the PSC and DNR's interpretation of § 96 and other provisions necessary to process RockGen's certification application was not only reasonable, but also fulfilled the purpose of Act 204, generally, and § 96, specifically.

## III

¶ 26. RURAL makes four challenges to the PSC's and the DNR's interpretation and application of § 96 to RockGen's certificate application: (1) RockGen was not a contractor as defined by § 96; (2) because of its size, the project did not qualify for § 96's accelerated procedures; (3) because of the Power Purchase Agreement, the project did not qualify for treatment under § 96; and, (4) because § 96 did not apply here, the PSC and DNR violated the Wisconsin Environmental Protection Act. We address each argument in turn.

### A.

¶ 27. RURAL contends that RockGen is not a contractor under § 96(1) because the PSC did not find that the contract between Alliant-WPL and RockGen was entered into by July 31, 1998, or officially approve a later date. Section 96 defines contractor as a "person specified in paragraph (b)3. that enters into a contract with an eastern Wisconsin utility for the construction

680

of electric generation capacity." 1997 Wis. Act 204, § 96(1)(a)3. Paragraph (b) requires that the contract was entered into with the selected bidder from those who had responded to the pending request for proposals, and that the contract was entered into by July 31, 1998, or by a later date approved by the PSC. 1997 Wis. Act 204, § 96(1)(b).

¶ 28. RURAL's contention is without merit. The PSC plainly could, and did, approve of the date that RockGen entered into the contract with Alliant-WPL, August 10, 1998, even though it was after July 31, 1998. On August 13, 1998, the PSC notified Alliant-WPL that it had reviewed the contract and specifically found that it met the conditions of § 96(1)(b)3. In addition, the PSC made a finding of fact in its Order that "[o]n August 10, 1998, Alliant-WPL and RockGen. . .entered into a contract for the construction of a combustion turbine (CT) electric generating facility. . .and into a Power Purchase Agreement." Order at 1. The PSC's approval of the contract, evident from its notification to Alliant-WPL and subsequent finding of fact is sufficient to show compliance with § 96(1)(a)3. of Act 204.

B.

¶ 29. RURAL next contends that RockGen's proposed facility did not qualify for § 96's expedited review because of § 96's reference to "request[s] for proposals." 1997 Wis. Act 204, § 96(1)(b). According to RURAL, that term limited § 96 to, in Alliant-WPL's case, projects with a capacity of 170 MW or less, based upon the PSC's mandate to Alliant-WPL in September 1997 to procure 170 MW of additional electric generation capacity.

¶ 30. Whether the PSC correctly interpreted and applied § 96 here turns on the purpose of § 96. Discerning the purpose or intent of the legislature is the lodestar of statutory interpretation. *Brauneis*, 2000 WI 69, ¶ 21. We start with the language of the statute in discerning the intent of the legislature and look no further if that intent is self-evident. *UFE, Inc.*, 201 Wis. 2d at 281; *Kelley Co. v. Marquardt*, 172 Wis. 2d 234, 247, 493 N.W.2d 68 (1992). "While it is true that statutory interpretation begins with the language of the statute, it is also well established that courts must not look at a single, isolated sentence or portion of a sentence, but at the role of the relevant language in the entire statute." *Alberte v. Anew Health Care Serv., Inc.*, 2000 WI 7, ¶ 10, 232 Wis. 2d 587, 605 N.W.2d 515 (citation omitted). Accordingly, we look at § 96 with regard to its role in 1997 Wisconsin Act 204.

¶ 31. From the language of Act 204, we find that its unambiguous purpose is to facilitate the increased reliability of Wisconsin's electric generation. This purpose, which the parties do not dispute, is evident from the changes Act 204 made to Wis. Stat. § 196.491(3) to streamline the certificate application process. Act 204 shortened the certificate application timeline from approximately 22 months to eight months. *Compare* Wis. Stat. § 196.491(2m)(3) (1995–96) *with* Wis. Stat. § 196.491(3). Act 204 also eliminated the requirement that a certificate application for new electric generation construction must comply with a pre-approved plan. 1997 Wis. Act 204, § 69.

¶ 32. Act 204 obviously intended to bolster Wisconsin's electric generation reliability not only by streamlining the new electric generation construction process, but also by providing for independent and

alternative sources for electric generation and capacity, namely, wholesale merchant plants. 1997 Wis. Act 204, §§ 38, 69, 81. Wholesale merchant plants are not owned by public utilities. Wis. Stat. § 196.491(1)(w). But, they supply electricity to utilities at wholesale. "[I]n this case, the electricity generated by RockGen Energy at the Facility will be sold to Alliant-WPL and other buyers at wholesale." Order at 6.

¶ 33.  Wholesale merchant plants cannot provide service to any retail customer in Wisconsin, ensuring that the plants will first serve the utilities. Wis. Stat. § 196.491(1)(w).[13] Wholesale merchant plants are also exempt from certain certificate application requirements. In considering an application for the construction of a wholesale merchant plant, the PSC is not to consider whether "[t]he proposed facility satisfies the reasonable needs of the public for an adequate supply of electric energy." Wis. Stat. § 196.491(3)(d)2. And, "the commission may not consider alternative sources of supply or engineering or economic factors if the application is for a wholesale merchant plant." Wis. Stat. § 196.491(3)(d)3. As the PSC noted in its Order here, the wholesale merchant plant provisions in Act 204 "is legislative recognition that the need to bolster the reliability of Wisconsin's generation calls for incentives for independent power producers to locate facilities of adequate size and scope in this state." Order at 6.

¶ 34.  Section 96, albeit with limited application, was intended to further the purpose of Act 204 to strengthen Wisconsin's electric generation reliability

---

[13] *But see* Wis. Stat. § 196.491(3m)(d): "The commission may not promulgate rules or issue orders that prohibit owners or operators of wholesale merchant plants from providing electric service to retail customers in another state."

by facilitating "the construction of new electric generation capacity" in the area served by eastern Wisconsin utilities. 1997 Wis. Act. 204, § 96(1)(b)(intro.). It is evident from § 96 that there was an additional purpose to expedite construction of that new electric generation capacity. Time was of the essence. The contractor for the new electric generation capacity construction had to submit its application for a certificate of public convenience and necessity to the PSC and its engineering plan to the DNR "no later than August 31, 1998." 1997 Wis. Act 204, § 96(1)(c). The DNR had 15 days to determine whether the engineering plan was complete and notify the contractor of the permits and/or approvals required for construction or operation of the proposed facility. 1997 Wis. Act 204, § 96(1)(d)1.[14] Then, the contractor had 10 days to apply for the required permits or approvals. 1997 Wis. Act 204, § 96(1)(d)2.[15] The DNR had 15 days to determine if the contractor's application was complete. 1997 Wis. Act 204, § 96(1)(d)3.[16] If the

---

[14] 1997 Wis. Act 204, § 96(1)(d)1. provides:

Within 15 days after the eastern Wisconsin utility provides the engineering plan, the department shall provide the eastern Wisconsin utility with a listing of each department permit or approval which, on the basis of the information contained in the engineering plan, appears to be required for the construction or operation of the facility

[15] 1997 Wis. Act 204, § 96(1)(d)2., as amended by 1997 Wis. Act 306, § 7d, provides:

Within 10 days after the department provides a listing specified in subdivision 1., the [contractor] shall apply for the permits and approvals identified in the listing.

[16] 1997 Wis. Act 204, § 96(1)(d)3., as amended by 1997 Wis. Act 306 § 7e, provides:

The department shall determine whether an application under subdivision 2. is complete and, no later than 15 days after the application is filed, notify the applicant about the determination. If

DNR did not make a determination regarding the plan, it was deemed complete by operation of law. *Id.* The DNR had 45 days to complete all action on the contractor's permit application, or the permit application would be deemed complete. 1997 Wis. Act 204, § 96(1)(d)4.

¶ 35. Similar deadlines—approximately half the time allotted for applications for certificates of public convenience and necessity after Act 204's streamlining—applied to the PSC. The PSC had 15 days to determine whether the certificate application was complete; if the PSC did not make a determination within the 15-day limit, the application was deemed complete. 1997 Wis. Act 204, § 96(1)(e)1.[17] The PSC had to hold hearings on the application, again, within a shortened

the department determines that the application is incomplete, the notice shall state the reason for the determination. A [contractor] may supplement and refile an application that the department has determined to be incomplete. There is no limit on the number of times that an applicant may refile an application under this subdivision. If the department fails to determine whether an application is complete within 15 days after the application is filed, the application shall be considered to be complete.

[17] 1997 Wis. Act 204, § 96(1)(e)1., as amended by 1997 Wis. Act 306, § 7f, provides:

1. The commission shall determine whether the application is complete and, no later than 15 days after the application is filed, notify the applicant about the determination. If the commission determines that the application is incomplete, the notice shall state the reason for the determination. A [contractor] may supplement and refile an application that the commission has determined to be incomplete. There is no limit on the number of times that a [contractor] may refile an application under this subdivision. If the commission fails to determine whether an application is complete within 15 days after the application is filed, the application shall be considered to be complete.

notice period of 15 days.[18] In addition, the PSC had to make a final decision on the application—approve it or reject it—within 90 days, or, by operation of law, the application was deemed approved. 1997 Wis. Act 204, § 96(1)(e)3.

¶ 36.   Even though § 96 provided for an accelerated certificate application review process, § 96 had limited duration and application. First, § 96 applied only to the eastern Wisconsin utilities. 1997 Wis. Act 204, § 96(1)(a)5., (b). Second, to qualify for the accelerated procedures under § 96, those eastern Wisconsin utilities had to have "issued a request for proposals soliciting bids for contracts for the construction of new electric generation capacity" before May 12, 1998. 1997 Wis. Act 204, §§ 96(1)(b)(intro.); 98m. Third, the eastern Wisconsin utilities had to evaluate and select a bid from those submitted and then enter into a contract with the winning bidder by July 31, 1998, or by a later date that the PSC approved. 1997 Wis. Act 204, § 96(1)(b).

¶ 37.   RURAL would further limit § 96 by reading into the term "request for proposals," a limit on the construction of new electric generation capacity to, in the case of Alliant-WPL, 170 MW. "[W]e will not read extra words into a statute to achieve a specific result." *Lang v. Lang*, 161 Wis. 2d 210, 224, 467 N.W.2d 772 (1991) (citing *Noack v. Noack*, 149 Wis. 2d 567, 576, 439 N.W.2d 600 (Ct. App. 1989)). On its face, § 96 uses the phrase that "each eastern Wisconsin utility that, before

---

[18] 1997 Wis. Act 204, § 96(1)(e)2. provides:

The commission shall hold a public hearing on an application that is determined or considered to be complete under subdivision 1. in the area affected pursuant to section 227.44 of the statutes and, at least 15 days prior to the hearing, shall give a class 1 notice regarding the hearing under chapter 985 of the statutes.

the effective date of this paragraph, has issued a request for proposals soliciting bids for contracts for the construction of new electric generation capacity," to designate those eastern Wisconsin utilities to which § 96 applied. Nowhere does § 96 limit the capacity of the construction of new electric generation capacity for those qualifying eastern Wisconsin utilities.

¶ 38. Even if such limit could be read into § 96, and we find that it cannot, Alliant-WPL's request for proposals contained no such limitation. Alliant-WPL's request offered bidders to consider a site between Janesville and Beloit that could support an electric generating plant with a capacity of 500 MW, referring to the capacity deficit that the PSC recommended be added on an expedited basis.[19]

¶ 39. We trust that had the legislature intended to further limit the applicability of § 96 by restricting the capacity of new electric generation construction for

[19] It is noteworthy that the PSC's September 1997 determination was based upon Advance Plan 7, a demand forecast and supply plan for the years 1994–2013 that the PSC had previously approved according to a statutory planning process that was in effect at that time. *See* Wis. Stat. § 196.491(2) (1995–96). By January 1998, Alliant-WPL projected that it needed an additional 705 MW in peaking capacity by the year 2003. This projection represented an increase of 373 MW in projected demand since Alliant-WPL had last submitted a projection to the PSC. Even though Act 204 replaced the advance plan process with a "strategic energy assessment" process (*see* 1997 Wis. Act 204, §§ 32–61), those provisions regarding planning did not go into effect until January 1, 1999, after the PSC had completed Advance Plan 8. *See* 1997 Wis. Act 204, § 98m(1). Even so, the limitation tying the capacity of a certificate application to a capacity previously approved in an advance plan had been eliminated by Act 204, effective May 12, 1998. 1997 Wis. Act 204, §§ 69, 98m; *see also* Wis. Stat. § 196.491(3)(d)1. (1995–96).

the eastern Wisconsin utilities to a specified capacity, the legislature would have done so. Consider § 27 of Act 204, which created Wis. Stat. § 196.377(2). That provision mandated that "no later than December 31, 2000, each eastern Wisconsin utility shall construct or procure, on a competitive basis, the construction of an aggregate total of *50 megawatts* of new electric capacity in this state that is, to the satisfaction of the commission, generated from renewable energy sources." 1997 Wis. Act 204, § 27 (emphasis added). "If a word or words are used in one subsection but are not used in another subsection, we must conclude that the legislature specifically intended a different meaning." *Oney v. Schrauth*, 197 Wis. 2d 891, 901–02, 541 N.W.2d 229 ( Ct. App. 1995) (citing cf. *Cardinal v. Leader Nat'l Ins. Co.*, 166 Wis. 2d 375, 388, 480 N.W.2d 1, 6 (1992)). We can think of no reason that this principle should not also apply to provisions of a single piece of legislation. Accordingly, we find that had the legislature intended to limit the eastern Wisconsin utilities to constructing a specific megawatt amount of new electric generation capacity in § 96, the legislature would have done so, as it did in § 27.[20]

¶ 40. In sum, we find that the language of Act 204, generally, and § 96 thereof, specifically, clearly indicates a legislative purpose to increase the reliability of Wisconsin's electric generation capability, and, in

---

[20] We do not find persuasive the after-the-fact media reports upon which the dissent relies, at ¶ 92, n.5. Just as *ex post facto* explanations from legislators cannot be relied upon to determine legislative intent, *ex post facto* newspaper articles cannot provide guidance as to legislative intent. *See State v. Consolidated Freightways Corp.*, 72 Wis. 2d 727, 738, 242 N.W.2d 192 (1976) (citing *Wisconsin S. Gas Co. v. Public Serv. Comm'n*, 57 Wis. 2d 643, 652, 205 N.W.2d 403 (1973)).

eastern Wisconsin, to bolster that reliability by expediting the construction of new electric generation capacity within the limits set forth in § 96.

¶ 41. It is not necessary to look to the legislative history of Act 204 because the language of the statute is unambiguous.

> The well established tenets of the plain meaning rule preclude courts from resorting to legislative history to uncover ambiguities in a statute otherwise clear on its face. No canon, however, prevents this court from examining legislative history "to reinforce and demonstrate that a statute plain on its face, when viewed historically, is indeed unambiguous."

*State ex rel. Cramer v. Schwarz*, 2000 WI 86, ¶ 37, 236 Wis. 2d 473, 613 N.W.2d 591 (quoting *State v. Martin*, 162 Wis. 2d 883, 897 n.5, 470 N.W.2d 900 (1991), and citing *State v. Sample*, 215 Wis. 2d 487, 508–09, 573 N.W.2d 187 (1998) (Abrahamson, C.J., concurring)).

¶ 42. Here, the legislative history reinforces our conclusion that the purpose of § 96 of Act 204 was to expedite the construction of new sources of electric generation for eastern Wisconsin, without also limiting the capacity of that new construction to the capacity the PS C determined to be an unmet need in September 1997. In response to the problems during the summer of 1997, a number of State Senators introduced the initial electric reliability legislation, 1997 Senate Bill 418, in January 1998. According to the Analysis of the Legislative Reference Bureau, Senate Bill 418 would have required the PSC to "issue an order that is designed to ensure, to the extent practicable, that the aggregate total electric generating capacity that is available. . .in a specified area of the state [that area served by east-

ern Wisconsin utilities] is increased by 500 megawatts."[21] 1997 Senate Bill 418, Analysis of the Legislative Reference Bureau, at 2. However, the full Senate did not consider Senate Bill 418. Instead, on March 19, 1998, a number of Assembly representatives introduced, at the request of Governor Tommy G. Thompson, Assembly Bill 940, publicly referred to as the Electric Reliability Act. According to Governor Tommy G. Thompson's press release, the Act provided three different "reliability solutions," "streamline the regulatory process, increase generation and improve the transmission system." Governor Tommy G. Thompson, Press Release (March 13, 1998) at 3. On April 28, 1998, Assembly Bill 940 was enacted as 1997 Wisconsin Act 204. Assembly Bill 940 made no reference to the 500 MW goal that Senate Bill 418 did.[22]

¶ 43. The Governor's Drafting Instructions also made no reference to a 500 MW limit. The Drafting Instructions indicate that the legislation was to direct

[21] Of interest from this legislative history file is the press release announcing the legislation from the consumer group Customers First!, "a coalition to preserve Wisconsin's reliable and affordable electricity." The press release states that Senate Bill 418 "require[d] [the] PSC to take immediate action to add *at least* 500 MW of least-cost [sic] environmentally sound generation within [eastern Wisconsin utilities]." 1997 Drafting Records Senate Bill 418, Press Release for Wisconsin Electric Reliability Act, Customers First! (emphasis added).

[22] The DNR's fiscal estimate of Assembly Bill 940 apparently refers to the non-statutory provisions of § 96, stating that a "shortened process is established for 500 MW of capacity currently under bid by the Wisconsin utilities, with a 45-day time limit for permit issuance." Fiscal Estimate, AB 940, 1997 Session. We do not find this single reference to 500 MW to dictate a capacity limitation on § 96, especially where all of the legislative history indicates that no such limit was intended.

eastern Wisconsin utilities with pending requests for proposals to complete those requests by a date certain, and to direct the PSC to complete action on related certificates of public convenience and necessity by a date certain. Governor Thompson's Reliability Proposal, Drafting Instructions (March 12, 1998) at 5. Conspicuously, there is no reference to a capacity limitation in those drafting instructions. However, there is a specific capacity reference in the drafting instructions that direct the eastern Wisconsin utilities to construct 50 MW in renewable energy resources.[23] *Id.* This provision became Wis. Stat. § 196.377(2), discussed above.

¶ 44. Our due weight deference review, as well as the legislative intent underlying public utility law, requires that we determine whether the PSC acted reasonably here. "[I]f we look to the entire act we discover some indication of a legislative intent that all orders of the commission shall be subject to the test of reasonableness." *Union Coop. Tel. Co. v. Public Serv. Comm'n*, 206 Wis. 160, 163, 239 N.W. 409 (1931) (referring to the public utility law, ch. 196, Stats.). Even though § 96 did not specifically limit the capacity of the construction of new electric generation facilities, we do not read § 96 to present a *carte blanche* for the construction of new electric generation facilities with

[23] Both the plain meaning of § 96 and its legislative history undermine RURAL's reliance on Senator Charles Chvala's statements on November 16, 1998 — six months after it became effective — that § 96 of Act 204 was to be limited to a 500 MW capacity. We should not rely upon the testimony of a member of the legislature to determine legislative intent. "[N]either a legislator, nor a private citizen, is permitted to testify as to what the intent of the legislature was in the passage of a particular statute." *Consolidated Freightways Corp.*, 72 Wis. 2d at 738.

unlimited capacity. Section 96 imposed many limitations, and the PSC, the DNR, Alliant-WPL and RockGen abided by those limitations. Moreover, we find that the PSC reasonably interpreted § 96 to apply to RockGen's certificate application for a facility with a capacity of *up to* 525 MW. This capacity does not unreasonably exceed the 500 MW capacity deficit that PSC discovered in September 1997, an amount that was set prior to Alliant-WPL's subsequent projections in January 1998 indicating additional peak capacity shortfall.[24]

¶ 45.    We are further convinced that the PSC reasonably applied § 96 because the PSC specifically found in its Order that "the public convenience and necessity require the Project." There is substantial evidence in the record to support this finding. There existed an immediate need in eastern Wisconsin for at least 500 MW in electric generation capacity. The proposed facility was situated so that three eastern Wisconsin utilities, WEPCO, MGE and Alliant-WPL, would have access to the electricity generated there because all three were or could be connected to the substation through which the electricity is to be transmitted. As the PSC concluded, "the 525 MW Facility will be a valuable addition to Wisconsin's electric energy portfolio, enhancing not only generation available to serve native load, but bolstering the

---

[24] Indeed, as the dissent notes at ¶ 88 n.3, in February 1999, the PSC also approved WEPCO's certificate application to build a 300 to 360 MW facility even though the PSC had initially ordered WEPCO only to procure 250 MW in September 1997. Obviously, had the PSC limited the utilities to the PSC's initial projections, there would have been an even greater shortfall in the needed supply.

transmission system, allowing increased imports of electricity in times of need." Order at 5.

¶ 46.   The PSC's interpretation and application of § 96 here to expedite the processing of RockGen's application for a certificate of public convenience and necessity was not only reasonable, it also furthered the purpose of Act 204 generally, and § 96 specifically, to "streamline the regulatory process, increase generation and improve the transmission system," in the Governor's words. Governor Thompson's Reliability Proposal, Drafting Instructions (March 12, 1998) at 5. The due weight deference standard requires that the "court will not overturn a reasonable agency decision that comports with the purpose of the statute *unless* the court determines that there is a more reasonable interpretation available." *UFE, Inc.*, 210 Wis. 2d at 286–87 (emphasis added). The petitioners have not provided a more reasonable interpretation. *Id.* at 288. And, we have not found a more reasonable interpretation. Consequently, we will not overturn the PSC's decision here.

¶ 47.   If, however, there was any error in applying § 96's expedited procedures considering the date or terms of the Power Purchase Agreement, or the capacity of the proposed project, that error would have been harmless procedural error. Only if "the fairness of the proceedings or the correctness of the action has been impaired by a material error in procedure or a failure to follow prescribed procedure," will this court remand the case to the agency. Wis. Stat. § 227.57(4).

■
¶ 48.   The burden is on RURAL to establish that a claimed procedural error is prejudicial. *Nu-Roc Nursing Home, Inc. v. DHSS*, 200 Wis. 2d 405, 418, 546 N.W.2d 562 (Ct. App. 1996). In *Nu-Roc*, the nursing

693

home complained of error because the Department improperly shortened the time during which the nursing home could submit objections to the Department's proposed decision denying medical assistance reimbursement. *Id.* at 410, 417–18. The court of appeals disagreed.

> Nu-Roc fails to establish that "either the fairness of the proceedings or the correctness of the action" was impaired by shortening the reply date so as to warrant remand under § 227.57(4), Stats. Further, it fails to suggest how its reply would have been different had it been given the additional time.

*Id.* at 418. Here, too, RURAL has failed to establish that either the fairness of the PSC's proceedings or the correctness of its decision was impaired by following § 96. RURAL voiced concerns about the possible environmental impact of the proposed facility and purported deficiencies in the Environmental Impact Statement (EIS) that the PSC and DNR prepared. But RURAL only raised questions about the procedure followed, not concrete defects.[25] This is insufficient to establish how the PSC's use of § 96's expedited procedure prejudiced RURAL. Consequently, remand is not warranted here.

---

[25] RURAL argued to the PSC that the accelerated timeline prevented the development of expert testimony that, according to RURAL, should be in the record. However, RURAL did not specify what that expert testimony would have established. Moreover, RURAL claims that had it obtained intervenor compensation, from the PSC to retain experts (*see* Wis. Stat. § 196.31), that would have mitigated the effect of the shortened timeline. However, RURAL has not challenged the PSC's decision to deny intervenor compensation, and, accordingly, we do not consider that decision here.

## C.

¶ 49. RURAL next contends that the Power Purchase Agreement between Alliant-WPL and RockGen disqualified the project from use of § 96 because the Agreement did not further the purpose of § 96 and Act 204. According to RURAL, where the size of the project was too big, Alliant-WPL's share of the electric generation—peaking capacity only—was too small. As we have already determined, the purpose of § 96 and Act 204 was to increase the reliability and capacity of electric generation in eastern Wisconsin on an expedited basis, and, the PSC's application of § 96 here reasonably furthered that purpose. We also find that the Agreement fulfilled the purpose of § 96 and Act 204.

¶ 50. Because the Agreement involves a wholesale merchant plant, the PSC could not consider whether "the proposed facility satisfies the reasonable needs of the public for an adequate supply of electric energy," or whether the "design and location or route is in the public interest considering. . .economic factors." Wis. Stat. § 196.491(3)(d)2., 3. Consequently, "the Commission ma[de] no finding in this proceeding as to the reasonableness of the purchase power agreement executed between Alliant-WPL and RockGen Energy." Order at 3. However, the fact that the Agreement facilitated the construction of a wholesale merchant plant fulfilled in part the purpose of Act 204 to increase reliability. As we noted above, the purpose of wholesale merchant plants is to provide independent and alternative sources of electricity, thereby increasing reliability.[26]

---

[26] A wholesale merchant plant is independent from the regulatory process of calculating a utility's fair return on the

¶ 51.  The Agreement also furthered the purpose of Act 204 and § 96 to increase the reliability of Wisconsin's electric generation supply because it facilitated Alliant-WPL's acquisition of the peaking capacity it needed. In addition, under the Agreement, Alliant-WPL has the first right to electricity generated at the facility, increasing the reliability of Alliant-WPL with the capability of supplying its customers with electricity when needed. The Agreement facilitated, by bringing the project within § 96's expedited process, the construction of a plant that will add to in-state electric generation capacity—"a valuable addition to Wisconsin's electric energy portfolio." Order at 5.

¶ 52.  RURAL contends, however, that when Alliant-WPL is not in need of the facility's electricity, RockGen intends to sell it to out-of-state customers, thereby undermining reliability. The law does not prohibit those sales. More importantly, the record does not support RURAL's contention. Alliant-WPL would have the first right to that electricity. As testified to before the PSC, the other utilities—those with access to the substation attached to the proposed project, WEPCO and MGE—could also purchase electricity from RockGen. (R. at 27:1220.). WEPCO and MGE could purchase electricity without incurring "wheeling" charges or surcharges for transmitting electricity across another utility's transmission system. *Id.* The overall arrangement here bolsters, rather than undermines, the reliability of electric generation in Wisconsin.

---

electricity it generates. "A merchant plant is a generating facility built on speculation. Unlike the current system, this means there is no regulatory guarantee of return on investment from the operation of the facility." Governor Tommy G. Thompson, Press Release (March 12, 1998) at 3.

## D.

¶ 53. RURAL'S final argument is that, because § 96 did not apply to RockGen's application, the DNR did not comply, and could not have complied, with the timeline established in the Wisconsin Environmental Protection Act. Wis. Stat. § 1.11. RURAL specifically contends that there should have been a draft EIS and a longer time for public comments on the EIS. We have already determined that § 96 applied to RockGen's application. We additionally find that the DNR and the PSC reasonably interpreted and applied the Wisconsin Environmental Protection Act (WEPA) in light of § 96.

¶ 54. WEPA, Wis. Stat. § 1.11, requires state agencies to prepare an EIS for any "major actions significantly affecting the quality of the human environment." The PSC and DNR prepared a joint EIS, as authorized by Wis. Adm. Code § NR 150.20(f). Typically, the PSC and the DNR would have prepared a draft EIS, taken public comments for 45 days, issued a final EIS, and then taken comments for another 30 days. Wis. Adm. Code § PSC 4.30. However, § 96(1)(e)3. limited the time that the PSC had to take final action on a qualified certificate application to 90 days. Consequently, using its authority under Wis. Stat. §§ 196.02(1), (3), 227.11, and 227.24, the PSC promulgated emergency rules that suspended the requirement of a draft EIS, and the corresponding public comment period thereon, for those projects that qualified for § 96's expedited procedures.

¶ 55. The DNR also had to operate within the 90-day window set by § 96(1)(e)3. Accordingly, the DNR reasonably interpreted its authority to shorten the public comment timeline to accommodate § 96's timeline. The DNR may shorten the public comment period for an EIS in order to comply with other statutory time

697

limits, i.e., the time limits in § 96. *See* Wis. Admin. Code §§ NR 150.20(2)(j); 150.22(3)(d)2. Given the time constraints in § 96, and its dominant purpose to expedite the construction of new electric generation capacity in eastern Wisconsin, the PSC and DNR reasonably abided by both § 96 and WEPA. They prepared a 200 page EIS, and kept it open for public comments for 20 days.

¶ 56. It is noteworthy that RURAL does not make any substantive challenges to the EIS, and only contends that a longer time frame should have been followed. Here, also, RURAL has failed to establish any resulting prejudice, and the error, if any, by the PSC and the DNR, would be harmless procedural error. Accordingly, there is no reason to vacate the DNR's Record of Decision certifying compliance with WEPA.

## IV

¶ 57. We now turn to Rockdale's objections to the PSC's Order: (1) the PSC improperly placed conditions on its Order; (2) the PSC improperly excluded Rockdale from land use considerations; and, (3) the PSC erred in its finding that the proposed project would not unreasonably interfere with land use and development plans. We address each in turn.

## A.

¶ 58. Rockdale contends that the PSC had no authority to issue a certificate to RockGen before the DNR had issued all the permits it identified that RockGen must obtain prior to construction. One of the conditions the PSC imposed is that "RockGen Energy shall obtain from [the] DNR all permits and approvals

that are required before beginning any construction."
Order at 8.

¶ 59.    According to Wis. Stat. § 196.395, the PSC
"may issue conditional. . .orders." The PSC's authority
to issue orders includes the authority to issue condi-
tional orders. *City of Appleton v. Transportation
Comm'n,* 116 Wis. 2d 352, 358, 342 N.W.2d 68 (Ct. App.
1983). However, "[t]he power contained in sec. 196.395
to issue conditional. . .orders is subject of course to the
procedural requirements of other provisions of ch. 196,
Stats., because they are *in pari materia.*"[27] *Mid-Plains
Tel. v. Public Serv. Comm'n,* 56 Wis. 2d 780, 787, 202
N.W.2d 907 (1973), quoting *Wisconsin Tel. Co. v. Public
Serv. Comm'n,* 232 Wis. 274, 287 N.W. 122 (1939).
Rockdale points to Wis. Stat. § 196.491(3)(e), contend-
ing that it prohibited the PSC from issuing the
certificate before RockGen obtained all of the DNR per-
mits. Wisconsin Stat. § 196.491(3)(e) states in
pertinent part:

> The commission may not issue a certificate of public
> convenience and necessity until the [DNR] has
> issued all permits and approvals identified in the
> listing. . .that are required prior to construction.

We disagree, given the particulars of this case. Where
the PSC has before it an application to process accord-
ing to the longer timeline in Wis. Stat. § 196.491(3), the
PSC should, and could, comply with subdivision (e).
However, had the PSC strictly complied with Wis. Stat.
§ 196.491(3)(e), the result would have defeated, rather
than fulfilled, the purpose of § 96 and Act 204. "In con-

---

[27] *In pari materia* is a canon of statutory construction that
statutes that relate to the same subject are construed together
to resolve inconsistencies that arise between statutes. *Black's
Law Dictionary* 794 (7th ed. 1999).

struing statutes that are seemingly in conflict, it is our duty to attempt to harmonize them, if it is possible, in a way which will give each full force and effect." *Milwaukee v. Kilgore*, 193 Wis. 2d 168, 184, 532 N.W.2d 690 (1995).

¶ 60. The PSC deemed RockGen's application to be complete on September 22, 1998. The PSC thus had until December 21, 1998 to take final action on the certificate application. 1997 Wis. Act 204, § 96(1)(e)3. If the PSC did not issue a decision regarding the application by December 21, 1998, the pocket provision of § 96(1)(e)3. of Act 204 would operate to issue a certificate on the application—without conditions. As of December 18, 1998, the date that the PSC issued its decision on RockGen's application, there was only one DNR permit outstanding.[28] The PSC was faced with three choices: one, issue the permit with the condition that RockGen must obtain all necessary permits; two, allow the pocket provision to operate and have a certificate issue on the application without any conditions; or, three, reject RockGen's certificate application because one permit had not yet been issued.

¶ 61. We believe that the PSC took an approach that not only harmonized the conflicting mandates of § 96 and Wis. Stat. § 196.491(3)(e), but also fulfilled the purpose to expedite the construction of much-needed electric generation capacity. That approach was to issue a conditional order. Had the PSC rejected RockGen's application because the DNR had not yet issued all the required permits, even though they were imminent, the PSC would have single-handedly defeated the mandate of § 96 to immediately address

---

[28] That permit, for air pollution control, was issued on January 25, 1999. Air pollution control permits are subject to a separate statutory timeline. Wis. Stat. §§ 285.60–285.69.

the shortfall of electric generation capacity in eastern Wisconsin that the legislature imposed upon the PSC. Here, the PSC reasonably interpreted and applied both § 96(1)(e)3. of Act 204 and Wis. Stat. § 196.491(3)(e) to give them both full effect by issuing the certificate here with the condition that RockGen obtain all necessary permits prior to starting construction.[29]

¶ 62. Rockdale contends that the PSC also improperly placed conditions on the certificate that delegated the PSC's authority over land use considerations to RockGen. For example, the PSC ordered that "RockGen Energy shall confer, consult and work with the town of Christiana to develop and execute a landscape plan that reasonably harmonizes the Facility landscaping with the surrounding area." Order at 9. Rockdale points to no authority, and we know of none, suggesting that such a condition is improper. There is no applicable statutory mandate, like Wis. Stat. § 196.491(3)(e), that conflicts with the PSC's authority under Wis. Stat. § 196.395. Accordingly, the PSC's authority under Wis. Stat. § 196.395 to issue conditional orders, applies.

¶ 63. If, however, the PSC made a procedural error by issuing RockGen a certificate before the DNR issued all the required permits, that error, like the error, if any, the PSC made by applying § 96 to RockGen's application, is harmless. Rockdale has not

_____

[29] The DNR also acted properly here. The DNR had to take final action on RockGen's application permit by October 15, 1998, 45 days after determining that RockGen's application was complete, or the application would be deemed complete. 1997 Wis. Act 204, § 96(1)(d)4. However, through the PSC's condition that RockGen had to obtain all necessary permits prior to starting construction, the DNR ensured that RockGen complied with applicable permitting despite § 96's pocket provision.

established that "the fairness of the proceedings or the correctness" of the PSC's Order was impaired by the PS C's issuance of that Order before the DNR completed the permitting process. Wis. Stat. § 227.57(4). The outstanding permit was issued before the circuit court heard arguments on Rockdale's instant challenge, and more than a month after the PSC Order was issued.

## B.

¶ 64.  Rockdale also contends that other conditions the PSC imposed pertaining to what Rockdale describes as zoning-type controls had the effect of wrongfully excluding Rockdale from its extra-territorial zoning authority over the Town of Christiana. As an example, Rockdale points to the PSC's condition that "RockGen Energy shall seek from the town of Christiana and, if applicable, the village of Rockdale, rezoning to deed restricted, exclusive agriculture, any Carpenter property lands not used for the construction and operation of the Facility." Order at 9.

¶ 65.  We find that the PSC reasonably interpreted and applied statutory authority that precludes zoning or other local ordinances from inhibiting the construction or operation of a facility. Wisconsin Stat. § 196.491(3)(i) provides that "[i]f installation or utilization of a facility for which a certificate of convenience and necessity has been granted is precluded or inhibited by a local ordinance, the installation and utilization of the facility may nevertheless proceed." The purpose of this provision is clear on its face. Local ordinances, such as zoning ordinances, cannot impede what has been determined to be of public convenience and necessity.

¶ 66.  Although it is unnecessary to look to the history of prior legislation regarding certificates of

public convenience and necessity, that history supports our conclusion. *State ex rel. Cramer*, 2000 WI 86 at ¶ 37. According to the legislative analysis of this prior legislation, one of the three effects of a certificate is to abrogate those local zoning ordinances that would impede the construction of a facility that was found to be of public convenience and necessity:

(1) [A certificate of public convenience and necessity] allows the utility to commence construction of the facility;

(2) It allows the utility to condemn land for the facility and operates as the determination of necessity of taking those lands described in the [certificate of public convenience and necessity]; and

(3) *It overrides all local zoning and other ordinances inhibiting the construction of the facility.*

Chapter 68, Laws of 1975, Wisconsin Legislative Council Staff's Summary and Analysis 10 (emphasis added).

¶ 67. The PSC cannot ignore land use considerations, however. Section 196.491(3)(d) requires the PSC to consider land use and development plans, among other environmental concerns:

[T]he commission shall approve an application for a certificate of public convenience and necessity only if the commission determines:. . .

3. The design and location or route is in the public interest considering alternative sources of supply, alternative locations or routes, individual hardships, engineering, economic, safety, reliability and environmental factors, except that the commission may not consider alternative sources of supply or engineering or economic factors if the application is for a wholesale merchant plant. . . .

4. The proposed facility will not have undue adverse impact on other environmental values such as, but not limited to, ecological balance, public health and welfare, historic sites, geological formations, the aesthetics of land and water and recreational use. . . .

6. The proposed facility will not unreasonably interfere with the orderly land use and development plans for the area involved.

Wis. Stat. § 196.491(3)(d) 3., 4., 6.

¶ 68. Even though § 96 expedited the time in which the PSC processed RockGen's application, the PSC still complied with Wis. Stat. § 196.491(3)(d), and in so doing, made the following findings:

12. The design and location of the Project at Christiana is in the public interest considering alternative sources of supply (except with respect to the Facility), alternative locations or routes (including Johnstown), individual hardships, safety, reliability, and environmental factors (other than the impact of air pollution).[30]

13. The Project at Christiana will not have undue adverse impacts on other environmental values such as, but not limited to, ecological balance, public health and welfare, historic sites, geological formations, the aesthetics of land and water, and recreational use.

---

[30] "In its consideration of environmental factors, the commission may not determine that the design and location or route is not in the public interest because of the impact of air pollution if the proposed facility will meet the requirements of ch. 285." Wis. Stat. § 196.491(3)(d)3. Chapter 285 of the Wisconsin Statutes, Wis. Stat. §§ 285.01–285.87, relates to air quality control and air pollution control permitting. The DNR issued RockGen the necessary air pollution control permit in January 1999.

14. The Project at Christiana will not unreasonably interfere with the orderly land use and development plans for the area involved.

Order at 2.

## C.

¶ 69. Rockdale contends that the record does not support the PSC's finding that the proposed project would not unreasonably interfere with land use and development plans. Rockdale specifically contends that the PSC did not consider the Town of Christiana Land Use Plan and the Dane County Farmland Preservation Plan. To the contrary, the record reflects substantial evidence and reasoning that supports the PSC's findings and shows that the PSC considered land use plans.

¶ 70. The record reflects that the PSC considered the Town of Christiana Land Use Plan insofar as the Town of Christiana's planning committee approved of the project. Order at 5. Although not identified by name, the record also reflects that the PSC did consider the purpose of the Dane County Farmland Preservation Plan—to preserve agricultural land in Dane County—even though the property was not under any farmland preservation agreements. According to the jointly-issued Environmental Impact Statement, the project would use less than 15 acres of agricultural land; land not used for the project would be re-zoned as exclusively agricultural. The EIS specifically considered the agricultural uses of the land surrounding the project site, and found that the project "would not interfere with farming on adjacent properties" and "would not impair the ability of the zoning authority to prohibit development incompatible with agriculture."

¶ 71.   In the 770-page EIS, the PSC and the DNR considered myriad environmental impacts. For example, there already exists near the site a large electric substation. Attached thereto are several electric transmission lines, strung on power poles that are taller than the stacks that are to accompany the power plant. Also nearby is an operating quarry with concomitant dust and blasting. That quarry may have to close, but another quarry is expected to open near the site.

¶ 72.   The PSC further developed its analysis of the proposed site at Christiana during the public hearing held there on November 16, 1998. For example, two dairy farmers who live near the Christiana site testified that they expected no significant impact from the plant. The EIS, as well as testimony at the public hearings, reasonably and sufficiently support the conclusion that RockGen's proposed project would only minimally impact the surrounding environment. Contrary to the view of the dissent, legitimate community and environmental concerns were adequately considered within the framework of the expedited procedure provided by the legislature.

V

■
¶ 73.   We conclude, in giving due weight deference to the PSC's and the DNR's experience with issuing certificates of public convenience and necessity and related environmental impact statements, albeit not under the novel circumstances presented here, that the PSC and DNR reasonably interpreted and applied § 96 of Act 204 and other relevant provisions of the Wisconsin Statutes in a manner which furthered the purposes of those provisions. The petitioners have not provided a more reasonable interpretation of the appli-

cable provisions, and we have not found one. We also conclude that substantial evidence and reasoning evident in the record support the PSC's and the DNR's findings. Unlike the dissent's hypertechnical interpretation of § 96 of Act 204, which ignores the potential electric generation crisis facing the citizens of Wisconsin today, we believe that our conclusion is not only reasonable and consistent with the legislature's intent, but it is also cognizant of an unmet need for which the citizens will pay dearly if it is not immediately addressed. Accordingly, for the reasons set forth, we affirm the order of the circuit court

*By the Court.*—The judgment of the circuit court is affirmed.

¶ 74.   JON P. WILCOX, J., did not participate.

¶ 75.   SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. The flaws in the majority opinion allowing the expedited process under § 96 of 1997 Act 204 for the RockGen power plant are many, but this dissent will touch upon only three points.

¶ 76.   First, § 96 of 1997 Act 204 expressly applies to new electric generation facilities of limited capacity. Accordingly, the Public Service Commission's (PSC) and majority opinion's interpretation that § 96 applies to the facility in question is not reasonable, much less the most reasonable interpretation. By an overreaching statutory construction, the majority opinion allows construction of a facility more than three times that authorized by the legislature.

¶ 77.   Second, the majority opinion errs in its standard of review. The majority opinion concludes that the PSC's interpretation of the law is entitled to due weight deference but sometimes applies the great

weight deference standard of review instead of the due weight deference standard.

¶ 78.   Third, the majority opinion's approval of the PSC's actions in this case undermines a legislative process designed to enable the PSC to consider legitimate community and environmental concerns.

I

¶ 79.   Section 96 of 1997 Act 204 expressly limits its application to specified facilities. Section 96(1)(b) applies to:

1)   "each eastern Wisconsin utility";

2)   "that before the effective date of this paragraph";

3)   *"has issued a request for proposals soliciting bids* for contracts for the construction of new electric generation capacity" (emphasis added).[1]

¶ 80.   The first phrase is defined in 1997 Act 204 and is not the subject of dispute. The effective date mentioned in the second phrase is May 12, 1998, and is not the subject of dispute.

---

[1] Section 96(1)(b), 1997 Act 204, states in its entirety:

By July 31, 1998, or a later date approved by the commission, each eastern Wisconsin utility that, before the effective date of this paragraph, has issued a request for proposals soliciting bids for contracts for the construction of new electric generation capacity shall do each of the following:
  1.   Complete its evaluation of the bids that were submitted in response to its request for proposals.
  2.   Select the bids for which it intends to award the contracts.
  3.   Enter into contracts with the persons who submitted the bids specified in subdivision 2. for the construction of the new electric generation capacity.

¶ 81.    We therefore look at the third requirement. Instead of stating the capacities set forth in the requests for proposals that had been issued before the effective date of the law, the legislature has incorporated these requests for proposals by reference into the law. Reading the language of the requests for proposals into the law is not, as the majority opinion would have us believe, reading extra words into the law.[2] Rather, reading the language of the requests for proposals into the law is exactly what the law directs.

¶ 82.    The legislature has told the reader that the expedited process applies only to utilities that have issued specified requests for proposals for facilities. If we want to know the facilities covered by the law, we must turn to the requests for proposals to which the legislature refers. It is these requests for proposals that limit the capacity of the new electric generation facilities.

¶ 83.    In sum, because the statute expressly incorporates the utilities' already issued requests for proposals, these documents must be considered as part of § 96. Indeed, § 96 makes no sense without examining the requests for proposals in existence when the law was enacted.

¶ 84.    The question then is do the already issued requests for proposals to which the legislature refers envision new facilities with specified capacities? We can easily locate these requests in the documents available to the drafters and the legislature. The documents point to Alliant-WPL's request for proposals being for a 150–170 megawatt (MW) facility.

¶ 85.    We begin with Governor Thompson's drafting instructions to the Legislative Reference Bureau, to

---

[2] *See* majority op. at ¶ 37.

which the majority opinion also refers. The governor's drafting instructions state that § 96 should cover "EWU [Eastern Wisconsin Utilities] utilities with pending RFPs (WEPCO, WPL, MGE) complete same by date certain." The drafter's note from the Legislative Reference Bureau to Governor Thompson dated March 16, 1998, explained that the expedited procedure drafted in § 96 would apply to those utilities that had outstanding requests for proposals, citing "Wisconsin Electric, Madison Gas and Electric and Wisconsin Power and Light." The drafter assured the governor that these utilities would therefore be able to enter contracts by July 31, 1998. The drafter explained that he had followed the schedules for awarding contracts appearing on the utilities' Internet Web sites. The drafting file makes clear that the reference in § 96(1)(b) to "requests for proposals" refers specifically to existing documents for three utilities. These documents were available to the governor and the drafter in drafting § 96.

¶ 86.   Next we review Alliant-WPL's request for proposals issued before May 12, 1998, to determine whether the request can reasonably be interpreted to refer to a 525 MW project, as the majority opinion concludes.

¶ 87.   The only reasonable interpretation of the request is that Alliant-WPL was requesting proposals for a facility in the 150–170 MW range. First, the opening sentence of Alliant-WPL's request for proposals calls "for contracts totaling 150 MW (net)." This call for contracts totaling 150 MW appears in the first section of the request for proposals entitled "Purpose." Based on the stated purpose of Alliant-WPL's request for proposals, the most reasonable interpretation of the legislature's reference to requests for proposals in § 96

is that it intended to authorize expedited review for Alliant-WPL's plan for 150 MW.

¶ 88. Additional language in Alliant-WPL's request for proposals supports this interpretation. The request for proposals stated that the resulting contracts "will satisfy the need for new electric generating capacity identified by the Public Service Commission of Wisconsin (PSCW) in its September 24, 1997 Letter Order to WP&L." Turning to the PSC's letter of September 24, 1997, we read that the PSC informed Alliant-WPL "that a reasonable assessment of WPL's resource requirements indicates a need for approximately 170 MW of firm capacity." Indeed, the PSC ordered Alliant-WPL to file an updated supply plan that would address the identified 170 MW need. Alliant-WPL responded by issuing the very request for proposals that is referred to above. In its response letter to the PSC dated December 5, 1997, Alliant-WPL described its issued request for proposals to the PSC as calling for sources with a "total generating capacity of 150 MW." Finally, in March 1998, the PSC approved each of the three utilities' plans to procure its share of the 500 MW total. Specifically, the PSC approved Alliant-WPL's plan to procure 170 MW of new capacity.[3] The PSC records clearly show that the

---

[3] *See* Public Service Commission and Department of Natural Resources, RockGen Energy Center Environmental Impact Statement v, 1 (October 1998), R.102, Item 90. At the same time it approved Alliant-WPL's plan for 150–170 MW, the PSC also approved MG&E's plan to procure 100 MW and WEPCO's plan to procure 250 MW. *See id.* at 1. Ultimately, the PSC issued certificates of public convenience and necessity to MG&E and WEPCO for facilities that bore a close resemblance to their approved requests for proposals. On December 22, 1998, the PSC approved MG&E's plan to build an 83 MW facility. On Febru-

understanding was that three Wisconsin utilities would construct facilities totaling 500 MW, with Alliant-WPL at 150–170 MW.[4]

¶ 89.   The majority opinion ignores the language of the request for proposals and also ignores the PSC actions leading up to the request for proposals and the adoption of § 96. Instead the majority opinion finds language in the request for proposals that it reads to support its conclusion that the 525 MW facility is included in the request for proposals issued before § 96 was enacted. Majority op. at ¶ 38. The majority opinion correctly quotes language from the request referring to the possibility of a larger capacity facility. But this language comes from portions of the request for proposals designed to allow the utility to refuse to accept proposals that comply with the request and to allow the

---

ary 2, 1999, the PSC approved WEPCO's plan to build a 300–360 MW facility in Neenah.

The majority suggests that the approximately one-third increase in size from WEPCO's initial authorization compares meaningfully to the more than threefold increase in size from Alliant-WPL's initial authorization for 150–170 MW. Majority op. at ¶ 44 n.24. The difference between an increase of one-third and an increase of more than threefold is obvious; the latter exceeds anyone's bounds of reasonableness.

[4] The PSC's own procedures reinforce the conclusion that the only reasonable interpretation of Alliant-WPL's request for proposals is that it called for a 150 MW facility. The PSC's public notice announcing Alliant-WPL's proposal to construct the RockGen facility only referred to 150 MW of new electric generation capacity. The absence of any other mention of the size of the planned facility in the PSC's public notice undermines the majority opinion's interpretation of the law. *See* PSC Notice of Proceeding, Investigation, Assessment of Costs, and Hearing, Dockets 9335–CE–101, 6680–CE–155, 6630–CE–263 (October 16, 1998).

utility to change its request. The language is, in my opinion, taken out of context and transparently stretched to support the PSC's interpretation of the law.

¶ 90. In light of the language in Alliant-WPL's request for proposals and the PSC history behind this request, with which everyone was familiar, the only reasonable interpretation is that § 96 authorizes the PSC to apply the expedited process to the 150–170 MW project it had previously approved for Alliant-WPL, rather than to a 525 MW project considered after the enactment of § 96 of 1997 Act 204.

¶ 91. Finally, the fiscal estimate accompanying A.B. 940, enacted as 1997 Act 204, further confirms the legislature's intentions. The fiscal estimate, prepared by the Department of Natural Resources (DNR), one of the agencies to apply § 96, states expressly that § 96 establishes a "shortened process. . .for 500 MW of capacity currently under bid by the Wisconsin *utilities*" (emphasis added). This reference to 500 MW is obviously to the proposals under bid by the three utilities mentioned in the governor's drafting instructions. The reference is not to a 500 MW facility to be built by a single utility.

¶ 92. The governor (who sponsored this legislation), the Legislative Reference Bureau (which reviewed the utilities' requests for proposals) and the legislature (which enacted legislation that specifically referred to the existing requests for proposals), intended to refer to the requests for proposals explained herein. If they did not, the terms of the requests would have to be set forth in the law. Instead the legislature took a permissible shortcut and incorpo-

rated the requests by reference, three requests that apparently everyone knew totaled 500 MW.[5]

¶ 93. Despite the request for proposals and the underlying PSC documents contemplating a *total* of 500 MW of new energy resources to be built by *three* Wisconsin utilities, the majority opinion asserts that the PSC's interpretation of § 96 as applying to a single utility's 525 MW facility that would sell a substantial portion of its electricity outside the state is reasonable.

¶ 94. The 525 MW power plant proposal is Wisconsin's largest power plant proposal in over 20 years. It is hard to believe that the legislature created a narrowly tailored exception for a giant power plant. Applying the due weight deference standard proposed by the majority, the only reasonable reading of the language of § 96 is that the legislature limited eligibility for the § 96 expedited process to power plant projects that had been mandated by the PSC to meet the identified capacity needs of three eastern Wisconsin utilities, including Alliant-WPL's needs for 150–170 MW, and that were described in the requests for proposals.[6]

___

[5] The media reported in July and August 1998 the understanding that appears in the documents referred to above. For example, the Milwaukee Journal Sentinel reported in July 1998 after passage of the law: "The state Public Service Commission ordered three Wisconsin utilities to use private developers to build a total of 500 megawatts of power plants by 2000. With the Alliant-Polski plan alone bigger than that, it's expected that far more generation will be built in Wisconsin than expected." Lee Bergquist, *$140 Million Power Plant Proposal to be Announced*, Milwaukee Journal Sentinel, July 24, 1998. *See also* Lee Bergquist, *More Power to You, for $2 billion*, Milwaukee Journal Sentinel, Aug. 9, 1998.

[6] The majority opinion contrasts the absence of a specific limit on plant size in § 96 with § 27 of 1997 Act 204, in which the

¶ 95.    I agree with Commissioner Farrow of the PSC who dissented from the PSC's order granting the certificate of public convenience and necessity. Commissioner Farrow properly read § 96 as narrowly authorizing an expedited process for specific projects contemplated by the legislature when it enacted 1997 Act 204.

## II

¶ 96.    The majority opinion sometimes confuses two standards of review: (A) the majority opinion adopts the due weight deference standard but its rea-

legislature instructed eastern Wisconsin utilities to procure "an aggregate total of 50 megawatts of new electric capacity" generated from renewable energy sources. It concludes that § 27 imposes a "limit" on the specific megawatts contemplated, while § 96 does not. *See* majority op. at ¶ 39. This argument is not persuasive.

Section 27 pertains to renewable energy that the utilities would not build absent special incentives to do so, despite the long-term benefits of reduced environmental degradation and decreased reliance on foreign energy sources. *See* Robert D. Hazel, *Note: Electric Utility Regulatory Reform: The Demise of Alternative Energy*, 8 S.C Envtl. L.J. 137, 139 (1999) (noting that renewable energy sources are more expensive and thus less likely to be offered in this era of deregulation). Here, the Wisconsin legislature has given the utilities the necessary incentive to procure renewable energy sources, by statutorily requiring them to procure 50 MW of new capacity. Thus, the reference to "50 megawatts of new electric capacity" is not a *limit*, but rather a necessary statement of the legislature's intent that the utilities derive a specific amount of their new capacity from renewable sources. I disagree with the majority's suggestion that the legislature included this reference to 50 MW in order to prevent the utilities from procuring *more* renewable energy sources.

soning points to the application of a de novo standard; and (B) although the majority opinion concludes that due weight deference is the appropriate standard of review in this case, its analysis sometimes reflects the great weight deference standard.

A.

¶ 97. The majority opinion acknowledges that the PSC has been inconsistent in its application of the expedited review provisions of § 96 of 1997 Act 204. Majority op. at ¶ 23 n.11. The majority then concludes that this inconsistent approach "argues against both de novo review and great weight deference." Majority op. at ¶ 23 n.11.

¶ 98. I disagree with the majority opinion that the PSC's inconsistent approach to statutory interpretation argues against de novo review. However, I do agree with the majority opinion that the PSC's inconsistent approach argues against giving the PSC's interpretation of the statute great weight deference.

¶ 99. I suggest that when an agency has taken inconsistent approaches the court might very well undertake a de novo review. In *UFE, Inc. v. LIRC*, 201 Wis. 2d 274, 286, 548 N.W.2d 57 (1996), the court concluded that when an agency is consistent in its treatment of an issue, it is not appropriate to apply a de novo interpretation. The implication from *UFE, Inc.* is therefore that the opposite must also be true: when an agency is *inconsistent* in its treatment of an issue, it *is* appropriate for a reviewing court to apply a de novo approach. Indeed, in *Brauneis v. LIRC*, 2000 WI 69, ¶ 18, 236 Wis. 2d 27, 612 N.W.2d 635, this court stated that "[d]e novo review also applies. . .'when the agency's position on an issue has been so inconsistent so as to provide no real guidance' " (quoting *UFE*, 201

Wis. 2d at 285). In the present case, the PSC has apparently had only two opportunities to interpret the relevant laws and those two interpretations are inconsistent. Under these circumstances neither of the agency's interpretations provides real guidance to the courts.

¶ 100. Upon reexamining our cases, I observe that the difference between the due weight standard and a de novo review seems slight indeed. Under the due weight deference standard, " 'a court need not defer to an agency's interpretation which, while reasonable, is not the interpretation which the court considers best and most reasonable.' " *UFE, Inc. v. LIRC*, 201 Wis. 2d 274, 286, 548 N.W.2d 57 (1996) (quoting *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 660 n.4, 539 N.W.2d 98 (1995)).[7] Thus under both the due weight deference standard and the de novo standard, a court will overturn an agency's interpretation in favor of an interpretation that the court concludes to be more reasonable than the agency's.

### B.

¶ 101. In any event, although the majority opinion correctly states the due weight deference standard, it sometimes applies the great weight deference standard. The majority opinion concludes in several places that the PSC's interpretation is reasonable and will therefore be upheld. Majority op. at ¶¶ 25, 44, 45, 49 and 73. The majority then shifts to the due weight deference standard, stating that no more reasonable

[7] "Once it is determined. . .that great weight deference is appropriate, we have repeatedly held that an agency's interpretation must then merely be reasonable for it to be sustained." *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 661, 539 N.W.2d 98 (1995).

interpretation exists. Majority op. at ¶ 46. Though this conclusory statement is based on the proper standard of review, it is not supported by the record or by the majority's analysis.

## III

¶ 102.    By approving the PSC's action in this case, the majority opinion has undermined a legislatively mandated process that would ensure adequate consideration of legitimate community and environmental concerns. I offer two examples.

¶ 103.    First, the majority opinion allows the PSC to issue a conditional certificate of public necessity and convenience before the DNR issues all necessary permits, contrary to Wis. Stat. § 196.491(3)(e). *See* majority op. at ¶¶ 58–61.

¶ 104.    When all is said and done, the majority opinion falls back on "harmless error" to justify its conclusion, which is contrary to the express language of the statute. Majority op. at ¶ 63. The majority's conclusion that the PSC's failure to follow the proper procedures is harmless error misses the point of the legislatively mandated procedures.

¶ 105.    A major aspect of § 96 is that the legislature has set forth detailed procedures for an expedited process to help ensure that the PSC reaches its conclusions based on adequate information and analysis.[8] This is not a case in which an agency failed to follow a minor procedural requirement. In this statute, the pro-

─────────

[8] *See* Wisconsin Legislative Council Staff Information Memorandum 75–8 at 1 (Oct. 20, 1975) (stating that the purpose of Wis. Stat. § 196.491 is "to prescribe an orderly and efficient process through which utilities can obtain a permit" and to clarify the "respective areas of jurisdiction of the PSC and the DNR").

cedure is a major issue. The PSC's failure to follow the legislatively mandated procedures casts doubt on its ultimate result, and this doubt cannot be glossed over with the phrase "harmless error."

¶ 106.   Second, the PSC's expedited time frame for the environmental impact statement reduced the time frame for public comment to a mere twenty days. RURAL argues that a twenty-day comment period is simply not enough time for adequate environmental review.

¶ 107.   The majority opinion faults RURAL for not making "any substantive challenges" to the environmental impact statement and for "failing to establish any resulting prejudice." Majority op. at ¶ 56. I disagree with the majority opinion. RURAL's brief identifies numerous deficiencies in the environmental impact statement, including specific areas where additional data and analysis were necessary.

¶ 108.   Moreover, I find it relevant that the PSC denied RURAL the intervenor compensation that would enable RURAL to hire experts to evaluate the environmental impact statement and conduct fieldwork to supplement the record where necessary. The majority opinion correctly states that the decision to deny intervenor funding is not before this court. Majority op. at ¶ 48 n.25. However, this decision substantially reduced the possibility of meaningful public comment within the expedited time frame.

¶ 109.   Viewed in their entirety, the PSC's actions in approving the RockGen project undermined the legislative process to enable the PSC to consider legitimate community and environmental concerns. The PSC's failure to follow legislatively mandated procedures casts doubt on its ultimate result.

¶ 110.    If the legislature wanted the expedited process set forth in § 96 of Act 204 to apply to a single 525 MW facility, it would have said so. The legislature, not this court, should determine how our electric generation needs should be met.

¶ 111.    For the reasons set forth, I dissent.

¶ 112.    I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.