837 A.2d 168

**In re JASON W.**

**No. 23, Sept. Term, 2003.**

Court of Appeals of Maryland.

Dec. 5, 2003.

Devy Patterson Russell, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for Petitioner.

Amy E. Brennan, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

WILNER, Judge.

We are called upon to examine the reach of Maryland Code, § 26–101(a) of the Education Article, which makes it a misdemeanor, subject to a $2,500 fine and six months in jail, for a person to "willfully disturb or otherwise willfully prevent the orderly conduct of the activities, administration, or classes of any institution of elementary, secondary, or higher education." We shall conclude that the statute does not cover the conduct that occurred here.

## BACKGROUND

Around 9:15 on the morning of December 13, 2001, a teacher at the Clear Spring Middle School in Washington County observed one of his students, Jason W., just outside the classroom scribbling something on a wall that bordered a stairway or ramp. As he walked over to investigate, he observed that Jason had written on the wall, in pencil, the words "There is a bomb," and that, as he approached, Jason began erasing the word "bomb" with his hand. The teacher inquired what Jason was doing but did not get a coherent answer, whereupon he escorted Jason to the principal's office.

The principal took a photograph of the writing, which was never placed in evidence, and called the police and Jason's mother. About an hour later, a deputy sheriff appeared at the school and, after giving Jason his *Miranda* warnings and in the presence of Jason's mother and the teacher, questioned him. Jason admitted having written "There is a bomb" on the wall and, when asked for an explanation, said that "he didn't know what he was doing." The sheriff went to look at the wall and saw only the words "There is a." Underneath those words were smeared pencil marks that were illegible. The principal obviously did not treat the message as an actual bomb threat, for he took no action to clear the school building, to alert the fire marshal or any bomb detection or disposal

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

agency, or to otherwise disrupt the normal operation of the school.

Upon this evidence, Jason was charged with juvenile delinquency based on his alleged violation of two criminal statutes: then-Maryland Code, Art. 27, § 9, making it a felony to threaten to explode a destructive device, and Education Article, § 26–101(a) which, as noted, makes it unlawful for a person wilfully to disturb or otherwise prevent the orderly conduct of the activities, administration, or classes of any institution of elementary, secondary, or higher education.[1] At the commencement of the adjudicatory hearing, the State, without objection, amended the petition to delete the charge under Art. 27, § 9, and replace it with an allegation that Jason had violated then-Art. 27, § 151A, making it a felony for any person to circulate or transmit to another, with intent that it be acted on, a statement or rumor about the location or possible detonation of a destructive device, knowing the statement to be false.

On the evidence submitted, the court found no violation of § 151A, perhaps because the teacher intervened before Jason could finish writing his message. Jason never indicated the location or possible detonation of a destructive device; he never stated where any bomb was located, whether in the school or somewhere else. The court treated § 26–101(a) as having been violated simply by Jason's writing on the wall, without regard to the content of his message. After consulting dictionary definitions of "disturb" and "orderly," the court concluded that (1) Jason's conduct was wilful in that it was intentional, and (2) "[w]riting on a wall, which is not authorized, would be a violation of this section because the administration would have to take care of the investigation, cleaning. It's out of the regular ordinary course of the school."

---

1.  Until October 1, 2002, the basic criminal code in Maryland was found in Article 27 of the 1957 Code. With the enactment of the new Criminal Law Article in 2002, as part of the on-going code revision process, Article 27 has been repealed, and its provisions are now found, in code-revised form, in the Criminal Law Article. The events here occurred while Article 27 was still in effect.

Although at the subsequent disposition hearing the State regarded the incident as a "minor" one, it was concerned about earlier incidents involving Jason, as brought out in a social service report and testimony by the principal. The court found Jason delinquent, retained him in the custody of his parents, but placed him on probation subject to good behavior and a number of more detailed conditions intended to assure good behavior. Jason appealed, contending that, absent evidence of any actual disturbance or disruption of school activities, the statute had not been violated. In a split, unreported decision, the Court of Special Appeals agreed and reversed the judgment. The panel majority noted that no evidence had been presented that classes were halted or that other students were even aware of the event, and that, although school personnel had to discipline Jason and the police were called, "the situation did not constitute the type of disturbance or disruption of the orderly conduct of school activities, administration, or classes contemplated by the statute."

## DISCUSSION

Section 26–101(a) has its roots in the first Statewide public education law enacted in Maryland, 1865 Md. Laws, ch. 160, and its history helps to illuminate its purpose and scope.[2] Ch. IV, § 6 of the 1865 law provided that any person who "shall willfully disturb, interrupt or disquiet any district school in session, or any persons assembled with the permission of the District [School] Commissioner in any district school house for the purpose of giving or receiving instruction in any branch of education or learning" shall forfeit $20 for the benefit of the school district, and, if payment was not immediately made, the person could be committed to jail until the payment *was* made, but not for more than 30 days.

---

2. The 1865 law was enacted in conformance with the mandate inserted in the 1864 Constitution that the General Assembly, at its next session, provide for a uniform system of free public schools. *See* Md. Const. of 1864, art. VIII, § 4.

For 100 years, that provision, as amended and re-codified from time to time, remained solely in the public education law, as an aspect of school administration. In 1966, a partially overlapping provision was placed in the criminal code as well, when the Legislature made it a misdemeanor, punishable by six months in jail and a $1,000 fine, for a person to refuse to leave *any* public building or grounds of a public agency during regular business hours, upon request to do so by an author-ized employee, if the surrounding circumstances were such as to indicate that the person had no apparent lawful business there or was acting in a manner "disruptive of and disturbing to the conduct of normal business" by the agency. *See* 1966 Md. Laws, ch. 552, enacting § 577A to Art. 27 of the Maryland Code. Three years later, the Legislature added another, more focused trespass provision to Art. 27, authorizing the highest official or governing body of the various State colleges and public schools to deny access to the school buildings or grounds to persons who had no lawful business there or who were acting in a manner "disruptive or disturbing to the normal educational functions of the institution" and making it a misdemeanor to trespass on the grounds, to refuse to leave upon request, or wilfully to damage or deface the property of the institution. *See* 1969 Md. Laws, ch. 627, enacting new § 577B to Art. 27. In the same session, as part of a compre-hensive revision of the public education law, the education provision, then codified as § 96 of Art. 77, was rewritten to tie into § 577A of Art. 27. *See* 1969 Md. Laws, ch. 405. With the 1969 amendment made by ch. 405, § 96 made it unlawful for any person, organization, or group "to disturb any public school in session, or to interfere in any manner with the normal operation of a public school," for the violation of which the remedies provided in § 577A of Art. 27 plus injunctive relief were available.

In 1970, through the enactment of a new section 123A to Art. 27, the criminal provisions were strengthened, largely as the result of the recent outbreak of riots and organized disturbances on college campuses and in some of the second-ary public schools. The broadening and focused application of

·trespass, disorderly conduct, or school disturbance laws was then a national phenomenon. *See* Sheldon R. Shapiro, *Participation of Student in Demonstration on or near Campus as Warranting Imposition of Criminal Liability for Breach of Peace, Disorderly Conduct, Trespass, Unlawful Assembly, or Similar Offense*, 32 ALR 3d 551 (1970). The Maryland Legislature had not yet begun to preserve committee files or to require written committee reports, so there is no official legislative history of the 1970 Maryland law, but contemporary press reports reveal that the bill was a response to a wave of rioting, violent racial confrontations, and vandalism at high schools in Prince George's County and Annapolis.[3]

Without any reference to either § 577A or § 577B of Art. 27 or § 96 of Art. 77, the 1970 Act made it a misdemeanor for any person (1) wilfully to disturb or otherwise prevent the

---

**3.** The disturbances at the Prince George's County schools were extensively reported in the *Washington Post.* A January 13, 1970 article noted that 22 students had been arrested at one of the schools after fighting broke out. One student set off some tear gas. *See* Douglas Watson, "21 Students Held in DuVal Clash," *Washington Post,* January 13, 1970, at C1. On February 11, 1970, the *Post* noted that, earlier in the Fall, 60 students had been arrested at another Prince George's County high school after racial disturbances. *See* Lawrence Meyer, "Board Acts to Calm Schools," *Washington Post,* February 11, 1970, at C5. On February 12, 1970, the Annapolis *Evening Capital* reported that roving gangs of Annapolis Senior High School students had smashed windows at the school, "roughed up" an assistant principal, and ripped down posters just before classes were to begin. More than half the students left the school after the disorders erupted, but the police had to be called to clear the hallways. *See Evening Capital,* February 12, 1970, at 1. The disturbances at the Annapolis school caught the attention of State legislators. *See* Hal Burdett, "County legislators, lawmen huddle on school disorders," Annapolis *Evening Capital,* February 14, 1970, at 1, 2. *See also* Michael Parks, "Pupil–Jailing Bill is Sent to Governor," *Baltimore Sun,* April 1, 1970 at C 24, noting that the law was prompted by "repeated disturbances" at two high schools in Prince George's County, one involving a "reign of terror" and the other racial bullying and harassment of students that led to "near riots," and that it gained support when students at several high schools in Baltimore "demonstrated in February, at times boycotting classes and marching on the city school administration building." When the bill was passed, the Annapolis *Evening Capital* reported that it had been "prompted by disorder in the schools." *See* "School disorder bills approved," Annapolis *Evening Capital,* April 1, 1970 at 3.

orderly conduct of the activities, administration, or classes of any school, college or university in Maryland or (2) to molest or threaten with bodily harm any student, employee, administrator, agent, or other person lawfully in a building or on the grounds or vicinity of any school, college, or university. With the enactment of that law, there thus existed somewhat parallel provisions in both the criminal and public education laws prohibiting, and making criminal, conduct that disrupted the public schools and colleges.

In the course of code-revising the education laws in 1977, the Legislature combined § 123A of Art. 27 with § 96 of Art. 77 into the new § 26–101 of the Education Article and, for consistency, moved § 577B of Art. 27 to the new Article as § 26–102. Section 26–101(a) is the provision at issue here, making it a criminal offense for any person wilfully to disturb or otherwise prevent the orderly conduct of the activities, administration, or classes of *any* institution of elementary, secondary, or higher education.[4] Section 26–101(b) picks up the provisions of former § 123A(b) that prohibited a person from molesting or threatening students, employees, and others lawfully on the school grounds. The school disruption provisions, though carrying criminal penalties, were thus removed from the criminal code and placed back in the public education laws, where they began.

When the 1970 Act was pending before the Legislature, some concern was expressed about its breadth. Debate in the Judiciary Committee of the House of Delegates was extensive, and the fear was raised that, if read literally, the Act "could be applied to a kindergarten pupil throwing a temper tantrum." *See Baltimore Sun,* April 1, 1970 at C24, *supra.* Clearly, however, that was not its intent; nor was that the legislative intent when those provisions were melded into § 26–101(a).

---

4. The Revisor's Note initially appended to § 26–101 and found in the 1978 edition of the Education Article, pointed out that, although former § 96 of Art. 77 applied only to the disruption of *public* schools, the parallel provision in § 123A of Art. 27 applied to *all* schools, that § 26–101 adopted the broader scope of § 123A, and that it conceivably applied to private schools as well.

The focus in 1970, which remained unchanged in 1977, was on riots and organized demonstrations and disturbances that actually impeded the schools from carrying out their administrative and educational functions. When the bill was presented to the Governor for signature, its sponsor noted that it would give police "a handy weapon ... with which to end these disturbances, disorders and riots." Michael Parks, "Mandel To Sign Bill Making Campus Disruption A Crime," *Baltimore Sun,* May 21, 1970, C8.

In this light, the view of the juvenile court that merely writing on the wall, without regard to the content of the writing, constitutes a violation of § 26–101(a) "because the administration would have to take care of the investigation [and] cleaning" is clearly untenable. Depending on the extent to which an unauthorized writing actually damages or defaces public school property, that conduct may or may not fall within the ambit of § 26–102(e)(3)—part of former Art. 27, § 577B—which makes it unlawful for a person wilfully to damage or deface any public school building, but Jason was not charged with that offense. The juvenile court's reading of § 26–101(a) would make criminal any unauthorized conduct that requires even a minimal response by a school official, and that would, indeed, raise the specter of a young child being haled into juvenile court and found delinquent for throwing a temper tantrum in school. As we have so often said, statutes must be given a reasonable interpretation, not one that is illogical, incompatible with common sense, or that would reach an absurd result that could not possibly have been intended by the Legislature. *See Whiting–Turner v. Fitzpatrick,* 366 Md. 295, 302, 783 A.2d 667, 671 (2001); *Facon v. State,* 375 Md. 435, 446, 825 A.2d 1096, 1102 (2003).

A typical public school deals on a daily basis with hundreds—perhaps thousands—of pupils in varying age ranges and with a variety of needs, problems, and abilities, scores of teachers, also with varying needs, problems, and abilities, and a host of other employees, visitors, and occasional trespassers. The "orderly conduct of the activities, admin-

istration, or classes" takes into account and includes within it conduct or circumstances that may momentarily divert attention from the planned classroom activity and that may require some intervention by a school official. Disruptions of one kind or another no doubt occur every day in the schools, most of which, we assume, are routinely dealt with in the school setting by principals, assistant principals, pupil personnel workers, guidance counselors, school psychologists, and others, as part of their jobs and as an aspect of school administration. Although, undoubtedly, some conduct is serious or disruptive enough to warrant not only school discipline but criminal, juvenile, or mental health intervention as well, (see, for example, In re Nahif, 123 Md.App. 193, 717 A.2d 393 (1998)), there is a level of disturbance that is simply part of the school activity, that is intended to be dealt with in the context of school administration, and that is necessarily outside the ambit of § 26-101(a).[5]

---

**5.** Section 7-306(b) of the Education Article requires the State Board of Education to establish guidelines for a code of discipline with standards of conduct and consequences for violations. Subsection (c) requires the local boards of education to adopt regulations that provide for educational and behavioral interventions, counseling, and student and parent conferencing, as well as "alternative programs, which may include in-school suspension, suspension, expulsion, or other disciplinary measures that are deemed appropriate." See also COMAR 13A.08.01.11. The Legislature has thus anticipated that disruptive behavior on the part of a student may result in a variety of sequentially serious discipline within the school setting. In conformance with the legislative mandate, the State Board of Education did promulgate guidelines for the local school systems. See MARYLAND GUIDELINES FOR A STATE CODE OF DISCIPLINE, State Department of Education (Jan. 1997). The guidelines created two classes of violations, all of which were regarded, in some way, as being disruptive in nature. Classification I includes "a wide range of behaviors which disrupt the learning environment," ranging from tardiness, disrespect (defined as "inappropriate comments or physical gestures to teachers or staff members or others"), dress code violations, classroom disruption ("behavior which interferes with the learning of others in a classroom or other learning environment"), and insubordination ("refusing to follow directions of teachers, staff, or administration"), to fighting, indecent exposure, vandalism, destruction of school property, and sexual activity. Id., at 8, 19. The interventions recommended for those violations include student and parent conferences, mediation, counseling, community service, loss of various privileges, detention, restitution, in-school suspension, and sus-

The words "disturb or otherwise willfully prevent," as used in § 26–101(a), cannot be read too broadly or too literally. A child who speaks disrespectfully or out of turn, who refuses to sit down or pay attention when told to do so, who gets into an argument with another student, who throws a rolled-up napkin across the room, who comes to class late, or even one who violates the local dress code in some way, may well disturb the class and, if sent to the principal, may divert the teacher or the principal from other duties for a time, but surely that conduct cannot be regarded as criminal because it is temporarily disruptive. We reject the State's argument that there need not be any "actual disturbance." The only sensible reading of the statute is that there must not only be an "actual disturbance," but that the disturbance must be more than a minimal, routine one. It must be one that significantly interferes with the orderly activities, administration, or classes at the school.

There was no such disturbance here. The principal did not take the writing as an actual threat, and, fortunately, he was accurate in his assessment. Had a credible bomb threat been made and action appropriate to that threat been taken, the situation would be quite different. On these facts, the Court of Special Appeals was correct in reversing the finding of delinquency.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

Concurring Opinion by HARRELL, J., in which RAKER and BATTAGLIA, JJ., join.

---

pension. *Id.,* at 9. Classification II offenses are more serious. They include such things as possession of weapons, physical attacks, theft, stalking, and possession of contraband, and the sanctions include extended suspension and expulsion. *Id.,* at 9–10. Some of the conduct, even in Classification I, is, itself, criminal, and may be punished in delinquency proceedings. Most of the conduct in Classification I is not itself criminal, however, and could hardly have been intended to be made criminal simply by characterizing it as disruptive to the learning environment.

HARRELL, Judge, Concurring, joined by RAKER and BATTAGLIA, JJ.

I concur in the Court's opinion and judgment. I write separately to comment on the appropriateness of relying on newspaper articles as sources for divining legislative intent. (*See* op. at 602 n. 3, and 604). Generally, it is unwise for courts to rely on the fruit of the Fourth Estate[1] in such endeavors. As apparent justification for recourse to such in the present case, Judge Wilner notes that, at the time of the enactment of the 1970 law, "[t]he Maryland legislature had not yet begun [regularly] to preserve committee files or to require written committee reports, so there is no official legislative history" of the 1970 version of the statute at issue here. For that reason, the present situation may well be one of the *rare* occasions when it is appropriate for a court to consider, to some degree, relatively contemporaneous relevant newspaper articles in ascertaining the legislative intent of an enactment of comparable vintage. Nonetheless, even when appropriate to do so, the use of newspaper accounts should be approached with caution and selectivity.

I subscribe generally to what Judge Cole stated in 1983 in his dissent in *Hornbeck v. Somerset County Bd. of Ed.*, 295 Md. 597, 458 A.2d 758 (1983), where, in response to the majority's reliance on newspaper accounts of the Maryland Constitutional Convention of 1867 in interpreting a provision of the Maryland Constitution (*Hornbeck*, 295 Md. at 626–28, 458 A.2d at 773–74), he wrote: "Newspaper articles [ ] are hardly the most reliable sources for extrapolating legislative intent; they certainly are not adequate substitutes for cogent

---

1. The "Fourth Estate" is the press, or journalists in general. The term is commonly attributed to the historian Thomas Carlyle:

> [Edmund] Burke said there were Three Estates in Parliament; but, in the Reporters' Gallery yonder, there sat a *Fourth Estate* more important far than they all.... Printing ... is equivalent to Democracy.... Whoever can speak, speaking now to the whole nation, becomes a power, a branch of government, with inalienable weight in law-making, in all acts of authority.

> Thomas Carlyle, *On Heroes, Hero-worship, And The Heroic In History* (Lecture V, 1840), *available at* http://gutenberg.net/(Project Gutenberg).

analysis of the *purpose* of a provision as discerned from its historical context and basic goals." *Hornbeck,* 295 Md. at 661, 458 A.2d at 792 (emphasis in original). Judge Cole and I are not alone in our skepticism.

Jack Schwartz and Amanda Conn, in their article *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History,* 54 Md. L.Rev. 432, 437 (1995), warned generally that:

> The Court of Appeals has gone awry by failing to make clear that not all legislative history has equal value in the court's exercise of assigning probabilities to various statutory readings. Too often the court has not differentiated the reliable from the unreliable, evidence that genuinely might reflect the legislative purpose underlying the enacted bill from evidence that reflects little more than someone's effort to gain leverage in the process. By indiscriminately assigning essentially the same weight to each form of legislative history, the court makes an error of the same type as affording legislative history too much or too little weight altogether.

*Id.* at 437. They concluded that, in order "to be the faithful investigator of legislative purpose that it claims to be, the [C]ourt should discard its fascination with potentially misleading scraps in the legislative history and focus instead on the clues that matter." *Id.* at 465.

A major treatise writer on the subject of statutory construction cautions against the use of unofficial sources in aid of ascertaining legislative intent. "Statements from nonofficial sources having no special connection with the preparation and proposal of a bill are not generally considered for interpretation purposes." Sutherland Stat. Const. § 48.11 (5th Ed.). Sutherland points out that "interpretations of legislation made by those lacking statutory authority to do so are given less weight." *Id.* § 49.06. Nonetheless, he concedes that "the meaning attached by people affected by an act may have an important bearing on how it is construed." *Id.*

A number of courts have disparaged reliance on newspaper articles in similar contexts. In *Hulcher v. Commonwealth,* 39 Va.App. 601, 575 S.E.2d 579, 583, n. 3 (2003), the Virginia Court of Appeals declined "appellant's invitation to consider newspaper and journal articles written contemporaneously with the passage of the [ ] statute as an appropriate source of 'legislative history'." The Kansas Court of Appeals, in *Mitchell v. Rayl,* 8 Kan.App.2d 690, 665 P.2d 1117, 1119 (1983), expressed its unwillingness "to accept a newspaper article as conclusive proof of legislative intent." The Supreme Court of Wisconsin opined "we do not find persuasive the after-the-fact media reports upon which the dissent relies. . . . Just as *ex post facto* explanations from legislators cannot be relied upon to determine legislative intent, *ex post facto* newspaper articles cannot provide guidance as to legislative intent." *R.U.R.A.L. v. Public Service Comm'n of Wisconsin,* 239 Wis.2d 660, 619 N.W.2d 888, 904, n. 20 (2000). The Supreme Court of Vermont expressed a similar view, stating that "comments made by an attorney for the Department of Public Service to a newspaper reporter after the legislation passed are in no way relevant to the question of legislative intent." *In re Pet. of Quechee Serv. Co., Inc.,* 166 Vt. 50, 690 A.2d 354, 366, n. 7 (1996). The Supreme Court of California stated that "articles in newspapers or other unofficial publications cannot be considered as statements of legislative intent." *Takahashi v. Fish & Game Comm'n,* 30 Cal.2d 719, 185 P.2d 805, 813 (1947). The Minnesota Tax Court recently held that newspaper articles are not evidence of legislative intent because "none of the individuals were involved in the drafting or passage of the legislation, their statements were not made contemporaneously with the passage of the act, and the statements do not indicate that the individuals had any responsibility for the law's enactment." *ILHC of Eagan, LLC v. County of Dakota,* 2003 WL 21108385 at *4, 2003 Minn. Tax Lexis 22 at *11–12 (Minn.Tax 2003).

Courts that have employed news accounts in their search for legislative intent are mindful of the inherent pitfalls and parse narrowly the appropriateness of the circumstances in

which they consider the articles. Certain federal courts have accepted newspaper articles as evidence bearing on legislative intent only when the relevant legislative body or bodies did not maintain records of official legislative history. *See May v. Cooperman*, 572 F.Supp. 1561, 1564 (D.N.J.1983), *but see* dissent in *May v. Cooperman*, 780 F.2d 240, 264 (3d Cir.1985) (commenting on the use of newspaper articles, Judge Becker observed that "the opinions and perceptions of the community are shaped by many factors.... Such perceptions are thus unreliable indicators of what the legislative purpose of the statute in fact was"); *Loewen v. Turnipseed*, 488 F.Supp. 1138, 1149 (N.D.Miss.1980). Another federal court admitted newspaper articles not for the truth of the information contained in them, but solely for the purpose of showing that they were published. *U.S. v. Halifax County Bd. of Ed.*, 314 F.Supp. 65, 75 (E.D.N.C.1970).

A number of State courts have treated newspaper articles similarly. In *Fox v. Bd. of Ed. of the Township of West Milford*, 93 N.J.Super. 544, 226 A.2d 471 (Law Div.1967), the court stated that "the legislative language is undoubtedly ambiguous, and requires resort to legislative history, contemporaneous construction and administrative interpretation to shed light on the true meaning and intent of the statute." 226 A.2d at 480 (citing favorably to a newspaper article issued contemporaneous to the statute in question). The Supreme Court of Arizona, after determining that the plain meaning rule of statutory interpretation was inapplicable, opined that "to find legislative intent, we consider the context of the statute, the language used, the subject matter, the historical background, the effects and consequences, and the spirit and purpose of the law." *Arizona Newspapers Ass'n v. Superior Court*, 143 Ariz. 560, 694 P.2d 1174, 1176 (1985) (relying on newspaper accounts to show information was published).

Where, as in the present case, there was no formal documentation of the legislative history maintained by the Maryland General Assembly or Governor at the time, I can accept the Court's careful and thoughtful recourse to relatively contemporaneous newspaper accounts of relevance to the legisla-

tion when it was under consideration and when it was enacted. Moreover, Judge Wilner's use of the articles he refers to serves only as context in the Court's analysis. Understanding the public crisis that animated the legislative initiative in 1970 (*see* op. at 602 n. 3) appears to be legitimate background information. The Court's analysis does not depend solely on these accounts in assigning to the statute the meaning it does. The bulk of the Court's analysis, apart from the newspaper accounts, represents the type of "cogent analysis of the purpose of a provision as discerned from its historical context and basic goals," as envisioned by Judge Cole in his *Hornbeck* dissent.

Judge RAKER and Judge BATTAGLIA join in this concurring opinion.