On Application for Rehearing

PER CURIAM.
The unpublished memorandum issued on September 29, 2006, is withdrawn, and the following opinion is substituted therefor.
P.J.B. was adjudicated delinquent on two charges of harassment, violations of §§ 13A-ll-8(a)(l)a. and 13A-ll-8(a)(2), Ala.Code 1975, and one charge of making a terrorist threat, a violation of § 13A-10-15(a)(l)b., Ala.Code 1975. He was committed to the Department of Youth Services.
With respect to the harassment charges, the evidence adduced at the delinquency hearing indicated that on October 5, 2005, while riding the school bus, P.J.B. told his classmate, A.B., that “ T can pay somebody to rape you.’ ” (R. 34.) A.B. testified that P.J.B. “lies a lot” (R. 38), but she stated that P.J.B.’s statement nevertheless scared her because her cousin had been raped and she did not know whether P.J.B. would carry through with the threat. In addition, on another occasion in December 2005, again while riding the school bus, P.J.B. put his hand down his pants, rubbed his buttocks area, and then put his fingers on S.B.’s nose.[1] When asked whether PJ.B.’s actions “shock[ed] you and alarm[ed] you,” S.B. answered in the affirmative. (R. 54.)
With respect to the charge of making a terrorist threat, the evidence adduced at the delinquency hearing indicated that on October 25, 2005, while riding the school bus, P.J.B. told school-bus driver Lynn Free, “ T want to set that field on fire.’ ” (R. 8.) When Free asked P.J.B. which field he was referring to, P.J.B. said the “ ‘corn maze.’” (R. 8.) Free testified that the *583 “corn maze” is a large “corn patch ... on River Road” that is open to the public during the weeks preceding Halloween, but that it had no connection to the school. (R. 8.) Free testified that when she finished her bus route at approximately 4:00 p.m. that day, she notified the principal of the Morgan County Learning Center, Lane Dillard, of P.J.B.’s threat regarding the field.[2] The following day, Dillard contacted Michael Cowart, an officer with the Decatur Police Department, and Officer Cowart and Dillard spoke with P.J.B. P.J.B. initially denied saying that he was going to burn the field. He then admitted that he had told Free that he was going to burn the field, but he claimed that the man who owned the field was going to hire him to burn it in order to clear it off. Later during the conversation, however, P.J.B. again changed his story and said that he was not going to burn the field to clear it off but that he had just said that he was going to burn the field as a joke. When asked whether having to meet with P.J.B. “disrupt[ed] [him] from being able to do [his] other school activities that [he] would have been doing,” Dillard answered that it had. (R. 25-26.)
On appeal, P.J.B. contends that the State failed to prove the charge of making a terrorist threat. He maintains that Dillard’s testimony that his meeting with P.J.B. disrupted his normal school activities was not sufficient to satisfy the requirement in § 13A-10-15(a)(l)b., the subsection under which he was charged, of “[c]ausing the disruption of school activities.” Specifically, he argues:
“[P.J.B.] would contend that speaking with students about problems is part of a principal’s duties. Merely speaking with a student does not constitute disruption of school activities. The learning environment of the school was maintained, no students were forced to leave their studies, no teachers were asked to come into the conference with the principal and Officer Cowart. In fact, Principal Dillard stated that this problem was not a school issue, but a legal one, which is why Officer Cowart was asked to attend this conference (R. 22-23). Reasoning that conferencing with a student due to a legal matter where some sort of criminal activity may or may not be involved is a disruption of school activity is a slippery slope. If one followed this line of reasoning ... [a]ny altercation at school that school officials had to take time out of their ‘normal’ schedules for could be considered a terrorist threat. Disciplining children is part of the normal function of school personnel and is not a disruption of school activities.”
(P.J.B.’s brief at pp. 9-10.) We agree with P.J.B.
Section 12-15-65(e), Ala.Code 1975, requires that an adjudication of delinquency be supported by “proof beyond a reasonable doubt, based upon competent, material, and relevant evidence.” In determining whether there is sufficient evidence to sustain a conviction or a delinquency adjudication, “ ‘a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’ ” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the *584 evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992).
Section 13A-10-15(a)(l), Ala. Code 1975, provides:
“(a) A person commits the crime of making a terrorist threat when he or she threatens by any means to commit any crime of violence or to damage any property by doing any of the following:
“(1) Intentionally or recklessly:
“a. Terrorizing another person,
“b. Causing the disruption of school activities.
“c. Causing the evacuation of a building, place of assembly, or facility of public transportation, or other serious public inconvenience.”
The phrase “disruption of school activities” is not defined in the Alabama Code, nor has it been construed by any appellate court in this State. As this Court explained in Carroll v. State, 599 So.2d 1253 (Ala.Crim.App.1992), aff'd, 627 So.2d 874 (Ala.1993):
“ ‘Where, as here, this Court is called upon to construe a statute, the fundamental rule is that the court has a duty to ascertain and effectuate legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained.’ Ex parte Holladay, 466 So.2d 956, 960 (Ala. 1985). ‘[T]he fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute.... In construing the statute, this Court should gather the intent of the legislature from the language of the statute itself, if possible .... We may also look to the reason and necessity for the statute and the purpose sought to be obtained by enacting the statute.’ Pace v. Armstrong World Industries, Inc., 578 So.2d 281, 283 (Ala.1991). ‘If possible, the intent of the legislature should be gathered from the language of the statute itself. However, if the statute is ambiguous or uncertain, the Court may consider conditions that might arise under the provisions of the statute and examine the results that will flow from giving the language in question one particular meaning rather than another.’ Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1305 (Ala.1991).
“ ‘[AJmbiguous criminal statutes must be narrowly interpreted, in favor of the accused.’ United States v. Herring, 933 F.2d 932, 937 (11th Cir.1991). ‘[I]t is well established that criminal statutes should- not be “extended by construction.” ’ Ex parte Evers, 434 So.2d 813, 817 (Ala.1983). “ ‘[Cjriminal statutes
must be strictly construed, to avoid ensnaring behavior that is not clearly proscribed.’ ” United States v. Bridges, 493 F.2d 918, 922 (5th Cir.1974).
“ ‘In United States v. Boston & M. RR Co., 380 U.S. 157, 85 S.Ct. 868, 870, 13 L.Ed.2d 728 (1965), the Supreme Court stated:
“ ‘ “A criminal statute is to be construed strictly, not loosely. Such are the teachings of our cases from United States v. Wiltberger, 5 Wheat. 76, 5 L.Ed. 37 [(1820)], down to this day. Chief Justice Marshall said in that case:
“““The rule that penal laws are to be construed strictly, is, perhaps, not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the *585 plain principle that the power of punishment is vested in the legislative, not in the judicial department.’ Id., p. 95.
“ ‘ “The fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition. United States v. Weit-zel, 246 U.S. 533, 38 S.Ct. 381, 62 L.Ed. 872 [ (1918) ].”
“ ‘Moreover, “one ‘is not to be subjected to a penalty unless the words of the statute plainly impose it,’ Keppel v. Tiffin Savings Bank, 197 U.S. 356, 362, 25 S.Ct. 443, 49 L.Ed. 790 [ (1905) ]. ‘[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.’ United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221-222, 73 S.Ct. 227, 229-230, 97 L.Ed. 260 [ (1952) ].” United States v. Campos-Serrano, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971).’
“Bridges, 493 F.2d at 923.
“ ‘Words used in the statute must be given their natural, plain, ordinary, and commonly understood meaning.’ Alabama Faim Bureau Mut. Casualty Ins. Co. v. City of Hartselle, 460 So.2d 1219, 1223 (Ala.1984). The general rule of construction for the provisions of the Alabama Criminal Code is found in Ala. Code 1975, § 13A-1-6: ‘All provisions of this title shall be construed according to the fair import of them terms to promote justice and to effect the objects of the law, including the purposes stated in section 13A-1-3.’ Among the purposes stated in § 13A-1^4 is that found in subsection (2): ‘To give fair warning of the nature of the conduct proscribed.’ ”
599 So.2d at 1264-65. Moreover, “the law favors rational and sensible construction,” and “[i]n construing statutes, courts are not required to abandon common sense.” Hankins v. State, 989 So.2d 610, 618 (Ala. Crim.App.2007).
Adthough numerous other states have statutes prohibiting terrorist threats, we have found none with language similar to the language in § 13A-10-15(a)(l)b. However, some states have statutes specifically prohibiting the disruption of an educational institution. See, e.g., Ariz.Rev.Stat. Ann. § 13-2911; Cal.Penal Code § 626.8; Fla. Stat. Ann. § 877.13; Md.Code Ann., Educ. § 26-101; Tex. Educ.Code Ann. § 37.124; and Utah Code Ann. § 76-8-710.
The Florida statute, Fla. Stat. Ann. § 877.13(l)(a), provides that “[i]t is unlawful for any person ... [kjnowingly to disrupt or interfere with the lawful administration or functions of any educational institution, school board, or activity on school board property .... ” In construing the scope of this statute, the Florida Court of Appeals for the Fifth District held in A.M.P. v. State, 927 So.2d 97 (Fla.Dist.Ct.App.2006), that two students fighting in a school bathroom did not disrupt the activities of the school where no classes or other activities were disrupted, even though the assistant principal had to break up the fight and had to spend two hours of her time taking statements from students and contacting parents. The Court reasoned:
“A number of courts, including this court, have recognized that this ‘statute seeks to prohibit acts which are “specifically and intentionally designed to stop or temporarily impede the progress of any normal school function or activity occurring on the school’s property.”’
*586 T.J. v. State, 867 So.2d 1238 (Fla. 5th DCA 2004), quoting M.C. v. State, 695 So.2d 477, 483 (Fla. 3d DCA 1997). A broad interpretation of the statute would turn virtually every infraction of school rules into a criminal act to the extent that the infraction occurred on school grounds, during school hours, and required the attention of school officials.
“The statute’s requirement that one must ‘knowingly’ disrupt the functioning of an educational institution suggests that the prohibited conduct requires some sort of purposeful interference with school activities. See, e.g., S.W.W. v. State, 833 So.2d 877 (Fla. 3d DCA 2003) (reversing a conviction under statute because record did not support a finding that the juvenile acted ‘with the intention that his behavior impede the successful functioning’ of the school or that he acted ‘with reckless disregard of the effect of his behavior’; court did not describe behavior on which charges were based); T.H. v. State, 797 So.2d 1291 (Fla. 4th DCA 2001) (juvenile could not be convicted of knowingly disrupting functioning of educational institution, where motive for fight was jealousy over girl). A conviction also appears to require ongoing school activities of some kind. T.H., supra (juvenile could not be convicted of knowingly disrupting functioning of educational institution, where fight occurred before school hours and no school activity or function was taking place at location of fight). This interpretation would be consistent with the notion that criminal statutes are to be strictly construed in favor of an accused. § 775.021, Fla. Stat. (2003). Here, there was no evidence offered of any intent to disrupt and no evidence that the function of the institution was disrupted. We vacate the conviction on this offense.”
927 So.2d at 100. Compare J.J. v. State, 944 So.2d 518 (Fla.Dist.Ct.App.2006) (evidence sufficient to sustain delinquency adjudication for disrupting an educational institution where student attempted to incite two other students to fight in the cafeteria, a school employee monitoring the cafeteria was unable to control the student and had to call the school dean and resource officer for assistance to forcibly escort the student from the cafeteria, and the incident interfered with serving the students breakfast), and T.J. v. State, 867 So.2d 1238 (Fla.Dist. Ct.App.2004) (evidence was sufficient to sustain delinquency adjudication for disrupting an educational institution where student disrupted class and had to be removed from class, at which time student continued his disruptive behavior by cursing and yelling at the learning-community assistant, whose job was to assist disruptive students and attempt to return them to class, and student’s behavior prevented learning-community assistant from assisting other students).
The Maryland statute, Md.Code Ann., Educ. § 26-101(a), provides that “[a] person may not willfully disturb or otherwise willfully prevent the orderly conduct of the activities, administration, or classes of any institution of elementary, secondary, or higher education.” In construing the scope of this statute, the Maryland Court of Appeals held in In re Jason W., 378 Md. 596, 837 A.2d 168 (2003), that a student’s writing on the wall of a school the words “ ‘There is a bomb’ ” did not disrupt the activities of the school where the principal did not take the threat seriously and did not evacuate the school or otherwise interrupt the normal operation of the school, even though as a result of the writing, the principal had to contact and meet with the police and the student’s mother, had to investigate the threat, and had to oversee the cleaning process. The Court explained:
*587 “[T]he view of the juvenile court that merely writing on the wall, without regard to the content of the writing, constitutes a violation of § 26 — 101(a) ‘because the administration would have to take care of the investigation [and] cleaning’ is clearly untenable. Depending on the extent to which an unauthorized writing actually damages or defaces public school property, that conduct may or may not fall within the ambit of § 26 — 102(e)(3)—part of foiv mer Art. 27, § 577B — which makes it unlawful for a person wilfully to damage or deface any public school building, but Jason was not charged with that offense. The juvenile court’s reading of § 26-101(a) would make criminal any unauthorized conduct that requires even a minimal response by a school official, and that would, indeed, raise the specter of a young child being haled into juvenile court and found delinquent for throwing a temper tantrum in school. As we have so often said, statutes must be given a reasonable interpretation, not one that is illogical, incompatible with common sense, or that would reach an absurd result that could not possibly have been intended by the Legislature. See Whiting-Turner v. Fitzpatrick, 366 Md. 295, 302, 783 A.2d 667, 671 (2001); Facon v. State, 375 Md. 435, 446, 825 A.2d 1096, 1102 (2003).
“A typical public school deals on a daily basis with hundreds — perhaps thousands — of pupils in varying age ranges and with a variety of needs, problems, and abilities, scores of teachers, also with varying needs, problems, and abilities, and a host of other employees, visitors, and occasional trespassers. The ‘orderly conduct of the activities, administration, or classes’ takes into account and includes within it conduct or circumstances that may momentarily divert attention from the planned classroom activity and that may require some intervention by a school official. Disruptions of one kind or another no doubt occur every day in the schools, most of which, we assume, are routinely dealt with in the school setting by principals, assistant principals, pupil personnel workers, guidance counselors, school psychologists, and others, as part of their jobs and as an aspect of school administration. Although, undoubtedly, some conduct is serious or disruptive enough to warrant not only school discipline but criminal, juvenile, or mental health intervention as well, (see, for example, In re Nahif, 123 Md.App. 193, 717 A.2d 393 (1998)), there is a level of disturbance that is simply part of the school activity, that is intended to be dealt with in the context of school administration, and that is necessarily outside the ambit of § 26-101(a).
“The words ‘disturb or otherwise willfully prevent,’ as used in § 26-101(a), cannot be read too broadly or too literally. A child who speaks disrespectfully or out of turn, who refuses to sit down or pay attention when told to do so, who gets into an argument with another student, who throws a rolled-up napkin across the room, who comes to class late, or even one who violates the local dress code in some way, may well disturb the class and, if sent to the principal, may divert the teacher or the principal from other duties for a time, but surely that conduct cannot be regarded as criminal because it is temporarily disruptive. We reject the State’s argument that there need not be any ‘actual disturbance.’ The only sensible reading of the statute is that there must not only be an ‘actual disturbance,’ but that the disturbance must be more than a minimal, routine one. It must be one that signifi *588 cantly interferes with the orderly activities, administration, or classes at the school.”
378 Md. at 604-06, 837 A.2d at 173-75 (footnote omitted).
Although the language in these other statutes is not identical to the language in § 13A — 10—15(a)(l)b., we nevertheless find the Florida and Maryland courts’ reasoning instructive. To broadly construe the phrase “disruption of school activities” to include a school principal’s having to meet with a student, about even a minor behavioral infraction, instead of performing other duties, would require us to ignore the requirement that criminal statutes be strictly construed in favor of the accused, would be illogical and incompatible with common sense, and would make criminal any threat by a student that requires the intervention of a school official, an absurd result that could not possibly have been intended by the legislature. For example, a student who threatened to assault another student and who had to be disciplined by a school official would be guilty of making a terrorist threat. We do not believe, nor can we hold, that the legislature intended such a result. Rather, it is clear to us that “the disruption of school activities” requires significant interference with activities specifically associated with the normal functioning of the school, such as, but not limited to, classes, extracurricular activities, parent/teacher conferences, and transportation of students.
As P.J.B. correctly argues, one of the common duties of a school principal is to meet with students. The fact that Dillard had to meet with P.J.B. as a result of PJ.B.’s threat to burn the cornfield did not disrupt any activity associated with the normal functioning of the school. No evidence was presented indicating that any classes or extracurricular activities were disrupted as a result of P.J.B.’s threat. And even the bus driver who reported the threat stated that she waited until after she completed her bus route to report the threat; thus, the transportation of students was likewise not disrupted. Therefore, we hold that the State failed to prove a prima facie case of making a terrorist threat.
Having determined that the evidence was insufficient to support a finding of guilt as to the charge of making a terrorist threat, we must now determine whether we may nevertheless uphold the delinquency adjudication based on the additional findings of guilt as to the two harassment charges.[3] In Chavibers v. State, 497 So.2d 607 (Ala.Crim.App.1986), 17-year-old Sam Chambers was adjudicated delinquent for one count of burglary in the third degree and three counts of theft of property in the second degree. This Court held that one of the theft counts had not been proven by the State because the value of the property was only $21, not more than $25 as required by the second-degree-theft statute in effect at the time. This Court stated:
“The juvenile court’s finding that Chambers was guilty of [one of the counts of] second degree theft ... is due to be reversed.
“On December 18, 1985, the Lowndes County Middle School was burglarized. Four or five dollars in school office supplies were missing as were ‘some oranges and apples’ valued at $8 and a teacher’s purse, also valued at $8.
“Theft of property in the second degree involves property with a value in excess of $25. Alabama Code 1975, *589 § 13A-8-4(e). Since the State only proved that the total of all the missing property was $21, Chambers’[s] adjudication of guilty of theft in the second degree cannot stand. The record does show that Chambers is guilty of theft in the third degree. However, this would not affect Chambers[’s] adjudication as a delinquent because he was also found guilty of other charges: third degree burglary and second degree theft ... and second degree theft .... ”
497 So.2d at 611. Although this Court stated in Chambers that the juvenile court’s finding of guilt on one charge was due to be reversed, because Chambers had been properly found guilty of the other charges, we affirmed Chambers’s adjudication of delinquency.
Based on Chambers, even though the evidence was insufficient to warrant a finding by the juvenile court that P.J.B. had made a terrorist threat, this would not affect P.J.B.’s adjudication of delinquency, because the juvenile court also found P.J.B. guilty of other charges. However, we believe that Chambers was wrongly decided insofar as it holds that a delinquency adjudication can be upheld based on an erroneous finding of guilt as to one charge when there are additional findings of guilt as to other charges, and we overrule it. To allow an erroneous finding of guilt to stand, even in the face of additional and proper findings of guilt as to other charges, is tantamount to relieving the State of its burden of proof as to the erroneous finding, and interferes with the juvenile court’s broad discretion in determining the appropriate disposition under § 12-15-71(e), A3a.Code 1975. As now Chief Justice Cobb noted in her dissenting opinion from this Court’s original unpublished memorandum affirmance of this case:
“I believe the better practice in cases such as Chambers and the one before us would be to remand the case with directions that the juvenile court vacate the finding of guilt on the erroneous charge and reconsider the finding of delinquency and the disposition on the remaining charges. This would better protect the rights of the juvenile offender and would return to the juvenile court the discretion to reconsider the proper disposition, especially because, in some cases, the juvenile court might determine that a less restrictive disposition or placement would be appropriate. See § 12—15—71(c), Ala.Code 1975.”
Therefore, we grant P.J.B.’s application for rehearing, and we remand this case for the juvenile court to set aside its finding of guilt as to the charge of making a terrorist threat and to reconsider its disposition under § 12—15—71(c), Ala.Code 1975, of the remaining two charges without consideration of the terrorist-threat charge. Due return shall be filed within 42 days of the date of this opinion.
APPLICATION GRANTED; UNPUBLISHED MEMORANDUM OF SEPTEMBER 29, 2006, WITHDRAWN; OPINION SUBSTITUTED; REMANDED WITH DIRECTIONS. 
BASCHAB, P.J., and McMILLAN, SHAW, and WELCH, JJ., concur.
WISE, J., concurs in part and dissents in part, with opinion.

. Neither A.B. nor S.B. are related to P.J.B., nor to each other.

. P.J.B. does not argue that his statement about burning the field did not constitute a threat within the meaning of § 13A-10-15, Ala.Code 1975; therefore, we assume for purposes of this opinion that his statement was a threat under § 13A-10-15, Ala.Code 1975.

. Although not argued by P.J.B. on appeal, we note that the evidence, as set forth above, was sufficient to support the juvenile court’s finding of guilt as to the harassment charges.